In the
United States Court of Appeals
For the Seventh Circuit

Nos. 01-1969 & 01-1970

JOYCE BOIM and STANLEY BOIM,
Individually and as Administrator of the
ESTATE OF DAVID BOIM,

Plaintiffs-Appellees,

v.

QURANIC LITERACY INSTITUTE
and HOLY LAND FOUNDATION FOR
RELIEF AND DEVELOPMENT,

Defendants-Appellants.

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 2905--George W. Lindberg, Judge.

ARGUED SEPTEMBER 25, 2001--DECIDED JUNE 5, 2002


  Before ROVNER, DIANE P. WOOD, and EVANS,
Circuit Judges.

  ROVNER, Circuit Judge.  In this case of
first impression, the parents of a young
United States citizen murdered in Israel
by Hamas terrorists have sued several
individuals and organizations for the
loss of their son. Two of the
organizational defendants moved to
dismiss the complaint, and the district
court denied the motion. In this
interlocutory appeal, we are asked to
consider the viability of a claim brought
under the never-tested 18 U.S.C. sec.
2333, which allows U.S. nationals who
have been injured "by reason of an act of
international terrorism" to sue therefor
and recover treble damages. We affirm the
district court's denial of the
defendants' motion to dismiss.

I.

  We derive the facts from the allegations
of the complaint. At this stage of the
proceedings, we must accept these
allegations as true, extending to the
plaintiffs the benefit of every
reasonable inference that may be drawn
from the complaint. Leatherman v. Tarrant

County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 164 (1993); Slaney v. The International Amateur Athletic Federation, 244 F.3d 580, 597 (7th Cir. 2001), cert. denied, 122 S. Ct. 69 (2001); Camp v. Gregory, 67 F.3d 1286, 1290 (7th Cir. 1995), cert. denied, 517 U.S. 1244 (1996). We may affirm the dismissal of that complaint only if it appears beyond doubt that the plaintiffs can prove no set of facts in support of their claim that would entitle them to relief. Slaney, 244 F.3d at 597.

David Boim was the son of Joyce and Stanley Boim, who are United States citizens. David held dual citizenship in the United States and Israel. In 1996, the Boims were living in Israel, where seventeen-year-old David was studying at a yeshiva. On May 13, 1996, David was murdered as he waited with other students at a bus stop near Beit El in the West Bank. He was struck by bullets fired from a passing car, and was pronounced dead within an hour of the shooting. His two attackers were later identified as Amjad Hinawi and Khalil Tawfiq Al-Sharif. The Palestinian Authority apprehended Hinawi and Al-Sharif, and temporarily imprisoned them in early 1997. They were released shortly thereafter, apparently pending trial. Al-Sharif subsequently killed himself and five civilians and injured 192 other people in a suicide bombing in Jerusalem on September 4, 1997. Two other suicide bombers joined him in this action. Hinawi, who confessed to participating in the shooting of David Boim, was eventually tried for David's murder by a Palestinian Authority court and was sentenced to ten years' imprisonment on February 17, 1998.

Both Hinawi and Al-Sharif were known members of the military wing of Hamas. The Boims describe Hamas as an extremist, Palestinian militant organization that seeks to establish a fundamentalist Palestinian state. The group is divided into two branches, one political and one military. The military branch receives orders and material support from the political branch. Hamas seeks to advance its political objectives through acts of terrorism and works to undermine the Middle East peace process through violent attacks on civilians. Hamas has a global presence, and terrorist operatives in Gaza and the West Bank receive their

instructions, funds, weapons and practical support for their missions from Hamas organizers throughout the world. The Boims believe that Hamas has command and control centers in the United States, Britain and several Western European countries. The leaders of these control centers coordinate fund-raising efforts from sympathetic parties in these various countries and then launder and channel the money to Hamas operatives in Gaza and the West Bank. They also arrange for the purchase of weapons and for the recruitment and training of military personnel. They work with local commanders in the West Bank and Gaza to plan terrorist attacks. Hamas was designated a terrorist organization by President William Jefferson Clinton in 1995 by Executive Order./1 In 1997, Hamas was desig-nated a foreign terrorist organization pursuant to 8 U.S.C. sec. 1189./2

The Boims allege that Hamas' military wing depends on foreign contributions, with approximately one-third of its multi-million dollar annual budget coming from fund-raising in North America and Western Europe. The Boims believe that the Quranic Literacy Institute ("QLI") and the Holy Land Foundation for Relief and Development ("HLF"), along with other defendants not involved in this appeal, are the main fronts for Hamas in the United States. They allege that these organizations' allegedly humanitarian functions mask their core mission of raising and funneling money and other resources to Hamas operatives in support of terrorist activities.

QLI is an Illinois not-for-profit corporation that purports to translate and publish sacred Islamic texts, but the Boims believe it is also engaged in raising and laundering money for Hamas. QLI also employed another defendant, Mohammed Abdul Hamid Khalil Salah, nominally as a computer analyst. The FBI has seized $1.4 million in cash and property from Salah, who is the admitted United States based leader of the military branch of Hamas. He has been prosecuted for channeling money to Hamas and for recruiting, organizing and training terrorist operatives in Israel. Salah is named on a list of Specially Designated Terrorists compiled by the United States Treasury Department's

Office of Foreign Assets Control./3

  HLF is also a not-for-profit corporation, whose ostensible mission is to fund humanitarian relief and development efforts. HLF's director has acknowledged providing money to Hamas, and the Boims allege that, although HLF purports to have a charitable purpose, its true function is to raise and channel money to Hamas for terrorist activities. The U.S. base of HLF's operations is in Texas. HLF also has offices in Jerusalem and in Illinois. HLF, QLI and the other organizational defendants are linked by interlocking directorates and by ties to Salah and Mousa Mohammed Abu Marzook, another individual defendant (not involved in this appeal) who has a leadership role in the military branch of Hamas./4

  According to the Boims, money flows from American contributors to Hamas in a three-step process: first, the front organizations solicit contributions; second, the leaders arrange for the money to be laundered and wired overseas; and third, Hamas operatives in Gaza and the West Bank use the money to finance terrorist activities. Because it is illegal to provide financial support to recognized terrorist groups, the money flows through a series of complicated transactions, changing hands a number of times, and being commingled with funds from the front organizations' legitimate charitable and business dealings. The funds are laundered in a variety of ways, including through real estate deals and through Swiss bank accounts. The Boims allege that money raised by HLF and QLI was transferred to Hamas terrorists using these various methods in order to finance terrorist activities. Hamas used the money raised in this way to purchase weapons to carry out terrorist attacks, including the attack on David Boim. Hamas regularly drew money from a pool of laundered funds in order to finance training, weapons purchases, lodging, false identification, communications equipment, lethal substances, explosives, personnel, transportation and other material support for terrorist operations. The Boims believe that expenditures from this pool of funds paid for the vehicle, machine guns and ammunition used to kill David Boim, and also paid for the training of Hinawi, Al-

Sharif and other Hamas operatives involved in the attack on David Boim. The funds were also used to provide a stipend for Al-Sharif's family, as it is a common practice to pay the families of suicide bombers in order to encourage others to volunteer for these activities.

The Boims bring their suit against HLF, QLI and other organizational and individual defendants pursuant to 18 U.S.C. sec. 2333. They charge that all of the defendants are civilly liable for David's murder. They name Hinawi and Al-Sharif as the persons who actually killed David, but allege that the other defendants aided, abetted and financed Hinawi and Al-Sharif. They assert that the organizational defendants provided material support or resources to Hamas as those terms are defined in 18 U.S.C. secs. 2339A and 2339B. The Boims seek compensation for the extreme physical pain David suffered before his death, and for the cost of his funeral and the loss of accretion to his estate due to his death at age seventeen. They also seek damages for their own extreme mental anguish and loss of the society of their son. They ask for $100,000,000 compensatory damages, $100,000,000 punitive damages, plus costs and attorney's fees, and request the trebling of damages pursuant to the statute.

In the district court, QLI and HLF moved to dismiss the complaint for failure to state a claim upon which relief may be granted. In particular, the defendants argued that section 2333 does not support a cause of action for aiding and abetting acts of international terrorism, and that the suit is foreclosed by the Supreme Court's ruling in Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 114 S. Ct. 1439 (1994). Because the defendants believed that aiding and abetting was the sole basis for the Boims' cause of action, they maintained that the complaint should be dismissed. The Boims argued to the district court that their section 2333 complaint could be sustained under any one of three different theories of liability. First, they maintained that providing material support to a terrorist organization was itself an act of international terrorism as defined in section 2331. Second, they argued that the defendants could be held civilly

liable under section 2333 because they violated sections 2339A and 2339B, the criminal statutes prohibiting the provision of material support to terrorists./5 Third, they contended that the defendants could be held liable under section 2333 on an aiding and abetting theory, and that the Supreme Court's holding in Central Bank, which addressed civil liability for aiding and abetting in the context of securities fraud claims, was distinguishable.

   The district court denied the motion to dismiss. Boim v. Quranic Literacy Institute, 127 F. Supp. 2d 1002, 1021 (N.D. Ill. 2001). Addressing the Boims' first theory, the court found that funding, without more, does not "involve violent acts or acts dangerous to human life." The court began with the statutory language, which sweepingly defines acts of international terrorism to include "activities involving violent acts or acts dangerous to human life," and found that this phrase was so broad that it provided little guidance concerning where to draw limits on the conduct Congress sought to curb. 127 F. Supp. 2d at 1013-14. Instead, "[c]ontributions to a foreign organization . . . without a further allegation of participation by the contributor, appear too far removed to constitute direct acts of international terrorism." Id. The district court concluded that Congress meant to reach beyond the persons directly involved in the violent act, but that liability should be limited to persons or organizations that knew about the violent act and participated in the preparation of the plan to commit the violent act. 127 F. Supp. 2d at 1014-15. Thus, as a matter of statutory interpretation, the Boims' allegations of funding terrorist organizations, without more direct dealing with the group, did not constitute activity involving violent acts or acts dangerous to human life. 127 F. Supp. 2d at 1015. Relying on a Fourth Circuit case, the court noted that where funding a terrorist group was the main allegation, the plaintiffs must also be able to show that the defendants providing the funds knew about the violent act and participated in the preparation of the plan to commit the violent act. See United States v. Wells, 163 F.3d 889 (4th Cir. 1998), cert. denied, 528 U.S. 841 (1999). Because

Salah was alleged to have participated in recruiting and training terrorists as well as channeling money to Hamas for terrorist activities, the court found that the claim against him could stand. 127 F. Supp. 2d at 1015. The court found the allegations of funding alone against the organizational defendants inadequate on a straight reading of the statute because, although the Boims alleged that HLF and QLI knew about Hamas' plans for terrorist activities, they did not allege that these groups participated in the preparation of the planning for the violent acts. Id.

The court then considered whether the action could be sustained under the Boims' second theory, that violations of 18 U.S.C. secs. 2339A and 2339B sufficed to create civil liability under section 2333. Sections 2339A and 2339B created criminal liability for persons providing material support to terrorists. The court agreed that conduct prohibited by sections 2339A and 2339B constituted "international terrorism" as that term was defined in section 2333. 127 F. Supp. 2d at 1016. The court noted that sections 2339A and 2339B require that support provided to terrorists be both knowing and material, but that civil liability for violations of sections 2339A or 2339B was limited to the period of time after sections 2339A and 2339B became law (1994 for section 2339A and 1996 for section 2339B). 127 F. Supp. 2d at 1016-17.

The court also addressed the Boims' closely related theory that Congress clarified the meaning of "acts of international terrorism" when it passed sections 2339A and 2339B. According to the district court, these criminal provisions demonstrated Congress' intent to include the provision of material support to terrorists in its definition of conduct involving violent acts under section 2331. If Congress imposed criminal liability for the provision of material support to terrorists, the district court reasoned, it surely meant for civil liability to reach at least that far. The court found further support for the proposition that Congress viewed the provision of material support to terrorists as an act of international terrorism in the repeal of jurisdictional immunity of a foreign state that has been designated a state sponsor of terrorism

when the state is sued for personal injury or death caused by the state's provision of material support or resources to terrorists as defined in section 2339A. See 28 U.S.C. sec. 1605(a)(7). "Considering Congress has permitted foreign states that have been designated state-sponsors of terrorism to be sued in United States courts for violating sec. 2339A, it is hard to argue that Congress did not intend to include such violations in its definition of 'terrorism' under the statutory scheme." 127 F. Supp. 2d at 1016.

Because section 2339A was enacted in 1994 and section 2339B was enacted in 1996, the court found that the plaintiffs would have to rely on their third theory of liability, aiding and abetting in order to reach conduct that occurred before 1994. 127 F. Supp. 2d at 1017. The court rejected the defendants' contention that the Supreme Court generally precluded aiding and abetting liability in federal civil causes of action in the Central Bank decision. Id. Rather, the district court found that aiding and abetting liability was available when a statute provided for it. Section 2333 relies on section 2331(1) for its definition of "international terrorism," and the court found that any action that falls under the definition of section 2331(1) may be the basis for a civil action under section 2333. Noting that aiding and abetting an act of international terrorism is itself a criminal violation, the court concluded that aiding and abetting terrorism is an activity that involves violent acts or acts dangerous to human life. The court sustained the Boims' cause of action on the theory that they had sufficiently alleged that the defendants aided and abetted international terrorism. 127 F. Supp. 2d at 1017-18. The court relied on the liberal standards of pleading under Federal Rule of Civil Procedure 8 to find that the Boims had alleged their claim sufficiently, reasoning that the complaint provided the defendants with adequate notice of the charges against them. 127 F. Supp. 2d at 1018.

The district court also rejected the defendants' claim that the Boims had inadequately alleged causation. HLF and QLI argued that the Boims had shown no connection between the defendants'

provision of money to Hamas and the murder of David Boim. The defendants characterized the Boims' complaint as alleging funding only through 1993, and maintained the funding was too remote in time to have proximately caused David's murder in 1996. The court first noted that the Boims alleged the defendants' funding extended beyond 1993, contrary to the defendants' characterization. The court also found that Congress indicated by its passage of sections 2339A and 2339B its belief that funding terrorism causes the harm of the terrorists' subsequent actions. 127 F. Supp. 2d at 1019. According to the court, sections 2339A and 2339B required that the aid to the terrorists be "material," a term that provides the causal link between the provision of funds and the injury from the terrorist action. The court found the complaint sufficient and stated that the plaintiffs would have to prove the funding at issue here was material to David Boim's murder. 127 F. Supp. 2d at 1019-20.

Finally, the court rejected the defendants' First Amendment challenge, finding that the complaint was not seeking to impose liability for mere political association or belief but rather for knowing and intentional support of the illegal aims of the defendant organizations. 127 F. Supp. 2d at 1020-21. Because the Boims are required to prove that HLF and QLI intended to further Hamas' illegal activities, either by aiding and abetting the terrorist action or by violating sections 2339A or 2339B, the district court found that the claim survived First Amendment scrutiny. Id. HLF and QLI appeal.

II.

The district court granted HLF and QLI's motion for a certificate of appealability, and we subsequently granted them leave to file an interlocutory appeal. See 28 U.S.C. sec. 1292(b). Interlocutory appeal is appropriate when (1) the appeal presents a question of law; (2) it is controlling; (3) it is contestable; (4) its resolution will expedite the resolution of the litigation, and (5) the petition to appeal is filed in the district court within a reasonable amount of time after

entry of the order sought to be appealed. Ahrenholz v. Board of Trustees of the University of Illinois, 219 F.3d 674, 675 (7th Cir. 2000). We have interpreted "question of law" to refer to a question regarding the meaning of a statutory or constitutional provision, regulation or common law doctrine. Id., 219 F.3d at 676. In this case, the district court correctly certified three issues for appeal:

(1) Does funding, simpliciter, of an international terrorist organization constitute an act of terrorism under 18 U.S.C. sec. 2331?

(2) Does 18 U.S.C. sec. 2333 incorporate the definitions of international terrorism found in 18 U.S.C. secs. 2339A and 2339B?

(3) Does a civil cause of action lie under 18 U.S.C. secs. 2331 and 2333 for aiding and abetting international terrorism?

See Boim v. Quranic Literacy Institute, et al., Case No. 00 C 2905, Order (N.D. Ill. February 22, 2001). The interpretation of sections 2331 and 2333 presents questions of law which will control the outcome of this case. As these are questions of first impression, the application of these statutes to the facts alleged here is certainly contestable, and the resolution of these issues will facilitate the conclusion of the litigation. The defendants filed their motions for certificates of appealability in the district court within a reasonable amount of time after entry of the district court's order denying their motion to dismiss (the district court's order was docketed January 10, 2001, QLI filed its motion on February 14, 2001 and HLF filed its motion on February 15, 2001). A panel of this Court granted the defendants' subsequent petitions for interlocutory appeal on April 6, 2001, and we now consider the issues certified by the district court.

We review de novo a district court's ruling on a 12(b)(6) motion to dismiss a complaint for failure to state a claim on which relief may be granted. Slaney, 244 F.3d at 597. At this stage of the proceedings, we accept all factual

allegations in the complaint and draw all reasonable inferences from those facts in favor of the Boims, the plaintiffs here. Id. We examine the complaint as a whole, and we will allow the case to proceed unless it appears beyond doubt that the Boims can prove no set of facts in support of their claim which would entitle them to relief. Id.; Pokuta v. Trans World Airlines, Inc., 191 F.3d 834, 839 (7th Cir. 1999). Federal Rule 8(a)(2) requires only that a complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); Leatherman, 507 U.S. at 168. The Boims thus need not set out in detail all of the facts upon which they base their claim. Rule 8(a) requires only that the complaint give the defendants fair notice of what their claim is and the grounds upon which it rests. Leatherman, 507 U.S. at 168. With these standards in mind, we turn to the statutes at issue here.

The Boims seek to recover against HLF and QLI pursuant to 18 U.S.C. sec. 2333, which provides, in relevant part:

Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

18 U.S.C. sec. 2333(a). "International terrorism," in turn, is a defined term:

[T]he term "international terrorism" means activities that--

(A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

(B) appear to be intended--

(i) to intimidate or coerce a civilian population;

(ii) to influence the policy of a

government by intimidation or coercion; or

(iii) to affect the conduct of a government by assassination or kidnapping; and

(C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

18 U.S.C. sec. 2331(1). These provisions became law in 1992./6 We turn now to the Boims' three theories of liability under section 2333: (1) that funding Hamas, without more, is an act of international terrorism because it is conduct that involves violent acts or acts dangerous to human life; (2) that funding Hamas constitutes the provision of material support or resources to a terrorist organization in violation of the criminal provisions set forth in sections 2339A and 2339B, and that violations of these criminal provisions give rise to civil liability under section 2333; and (3) that aiding and abetting an act of terrorism gives rise to civil liability under section 2333./7

A.

The plaintiffs' first theory is that the simple provision of funds to Hamas by QLI and HLF constitutes an act of international terrorism because it "involve[s] violent acts or acts dangerous to human life." The Boims liken payments to Hamas to murder for hire: the person who pays for the murder does not himself commit a violent act, but the payment "involves" violent acts in the sense that it brings about the violent act and provides an incentive for someone else to commit it. The Boims urge us to adopt a very broad definition of "involves" that would include any activity that touches on and supports a violent act. They argue that David's murder was indisputably a violent act, and we have no quarrel with that premise. But they further argue that the provision of money or in-kind services to persons outside the country who set up the

infrastructure used to recruit and train David's murderers, buy their weapons, and compensate their families also "involves" violent acts. The defendants, in turn, urge us to read the statute to hold liable only those who actually commit a violent act.

No court has yet considered the meaning or scope of sections 2331 and 2333, and so we write upon a tabula rasa. The starting point in all statutory analysis is the plain language of the statute itself. United States v. Wagner, 29 F.3d 264, 266 (7th Cir. 1994). We look to the language in order to determine what Congress intended, and we also look to the statute's structure, subject matter, context and history for this same purpose. Almendarez-Torres v. United States, 523 U.S. 224, 228 (1998) ("We therefore look to the statute before us and ask what Congress intended. . . . In answering this question, we look to the statute's language, structure, subject matter, context, and history--factors that typically help courts determine a statute's objectives and thereby illuminate its text."). The controversy here centers on the definition of international terrorism, and in particular on the definition of the word "involve," which is susceptible to many meanings. The statutory definition of international terrorism in section 2331(1) is drawn verbatim from the Foreign Intelligence Surveillance Act, 50 U.S.C. sec. 1801(c) ("FISA"). No court has yet expounded on the meaning or scope of "international terrorism" as it is used in FISA either, so we are not aided by that origin./8 A dictionary definition of "involve" demonstrates the many levels of participation that could constitute involvement. To involve is: to enfold or envelop so as to encumber; to engage as a participant; to oblige to take part; to occupy (as oneself) absorbingly; to commit emotionally; to relate closely; to have within or as part of itself; to require as a necessary accompaniment; to have an effect on. Webster's Ninth New Collegiate Dictionary (1983). Because of these many possibilities, we agree with the district court that we must look to the structure, context and legislative history of the statute to determine what Congress intended.

The government, in its very helpful amicus curiae brief, delineates some of the legislative history of sections 2331 and 2333. That history, in combination with the language of the statute itself, evidences an intent by Congress to codify general common law tort principles and to extend civil liability for acts of international terrorism to the full reaches of traditional tort law. See 137 Cong. Rec. S4511-04 (April 16, 1991) ("The [antiterrorism act] accords victims of terrorism the remedies of American tort law, including treble damages and attorney's fees."); Antiterrorism Act of 1990, Hearing Before the Subcommittee on Courts and Administrative Practice of Committee on the Judiciary, United States Senate, 101st Congress, Second Session, July 25, 1990 (hereafter "Senate Hearing"), Testimony of Joseph Morris, at 136 ("[T]he bill as drafted is powerfully broad, and its intention . . . is to . . . bring [in] all of the substantive law of the American tort law system."). In particular, the statute itself contains all of the elements of a traditional tort: breach of a duty (i.e., committing an act of international terrorism); injury to the person, property or business of another; and causation (injured "by reason of"). Although the statute defines the class of plaintiffs who may sue, it does not limit the class of defendants, and we must therefore look to tort law and the legislative history to determine who may be held liable for injuries covered by the statute.

The legislative record is replete with references to the then-recent decision in Klinghoffer v. Palestinian Liberation Organization, 739 F. Supp. 854 (S.D.N.Y. 1990), vacated, 937 F.2d 44 (2d Cir. 1991). See Senate Hearing at 1, 12, 17, 79, 83, 122, 133; H.R. Rep. 102-1040, at 5 (1992); 137 Cong. Rec. S4511-04 (April 16, 1991); 136 Cong. Rec. S4568-01 (1990)./9 Leon Klinghoffer was a U.S. citizen who was murdered in a terrorist attack on a cruise ship in the Mediterranean Sea. The district court found that his survivors' claims were cognizable in federal court under federal admiralty jurisdiction and the Death on the High Seas Act because the tort occurred in navigable waters. 739 F. Supp. at 858-59. The repeated favorable references to Klinghoffer indicate a desire on the part of Congress to extend this liability to

land-based terrorism that occurred in a foreign country. See Senate Hearing at 12, Testimony of Alan Kreczko, Deputy Legal Advisor, Department of State ("This bill . . . expands the Klinghoffer opinion."); H.R. Rep. 102-1040, at 5 (1992) ("Only by virtue of the fact that the [Klinghoffer] attack violated certain Admiralty laws and the organization involved--the Palestinian Liberation Organization--had assets and carried on activities in New York, was the court able to establish jurisdiction over the case. A similar attack occurring on an airplane or in some other locale might not have been subject to civil action in the U.S. In order to facilitate civil actions against such terrorists the Committee [on the Judiciary] recommends [this bill]."); 137 Cong. Rec. S4511-04 (April 16, 1991), Statement of Senator Grassley (section 2333 would "codify [the Klinghoffer] ruling and makes the right of American victims definitive"); 136 Cong. Rec. S4568-01 (1990).

The statute clearly is meant to reach beyond those persons who themselves commit the violent act that directly causes the injury. The Senate report on the bill notes that "[t]he substance of [an action under section 2333] is not de fined by the statute, because the fact patterns giving rise to such suits will be as varied and numerous as those found in the law of torts. This bill opens the courthouse door to victims of international terrorism." S. Rep. 102-342, at 45 (1992). This same report also remarks that the legislation, with "its provisions for compensatory damages, treble damages, and the imposition of liability at any point along the causal chain of terrorism," would "interrupt, or at least imperil, the flow of money." Id. at 22 (emphasis added). See also Statement of Senator Grassley, 136 Cong. Rec. S4568-01 at S4593 ("With the enactment of this legislation, we set an example to the world of how the United States legal system deals with terrorists. If terrorists have assets within our jurisdictional reach, American citizens will have the power to seize them."); Senate Hearing at 17, Statement of Alan Kreczko ("[F]ew terrorist organizations are likely to have cash assets or property located in the United States that could be attached and used to fulfill a civil judgment. The existence

of such a cause of action, however, may deter terrorist groups from maintaining assets in the United States, from benefitting from investments in the U.S. and from soliciting funds within the U.S."); Senate Hearing at 79, Statement of Joseph Morris ("[A]nything that could be done to deter money-raising in the United States, money laundering in the United States, the repose of assets in the United States, and so on, would not only help benefit victims, but would also help deter terrorism."). All of this history indicates an intent by Congress to allow a plaintiff to recover from anyone along the causal chain of terrorism.

But to the extent that the Boims urge a reading of the statute that would lead to liability for merely giving money to Hamas, a group which then sponsored a terrorist act in the manner the Boims have alleged, we agree with the district court, the defendants and the government that those allegations would be inadequate. To say that funding simpliciter constitutes an act of terrorism is to give the statute an almost unlimited reach. Any act which turns out to facilitate terrorism, however remote that act may be from actual violence and regardless of the actor's intent, could be construed to "involve" terrorism. Without also requiring the plaintiffs to show knowledge of and intent to further the payee's violent criminal acts, such a broad definition might also lead to constitutional infirmities by punishing mere association with groups that engage in terrorism, as we shall discuss later in addressing the First Amendment concerns raised here.

Additionally, the statute itself requires that in order to recover, a plaintiff must be injured "by reason of" an act of international terrorism. The Supreme Court has interpreted identical language to require a showing of proximate cause. See Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 265-68 (1992) (interpreting "by reason of" language in civil RICO provision to require a showing that the defendant's conduct proximately caused the plaintiff's injury). Foreseeability is the cornerstone of proximate cause, and in tort law, a defendant will be held liable only for those injuries that might

have reasonably been anticipated as a natural consequence of the defendant's actions. Suzik v. Sea-Land Corp., 89 F.3d 345, 348 (7th Cir. 1996); Restatement (2d) of Torts, secs. 440-447. In the circumstances of this case, the Boims cannot show that David Boim was injured "by reason of" the defendants' payments to Hamas in the traditional tort sense of causation unless they can also show that murder was the reasonably foreseeable result of making the donation. To hold the defendants liable for donating money without knowledge of the donee's intended criminal use of the funds would impose strict liability. Nothing in the language of the statute or its structure or history supports that formulation. The government, in its amicus brief, maintains that funding may be enough to establish liability if the plaintiff can show that the provider of funds was generally aware of the donee's terrorist activity, and if the provision of funds substantially assisted the terrorist act in question. See Halberstam v. Welch, 705 F.2d 472, 477 (D.C. Cir. 1983) (describing the standards for joint liability for tortious acts). We will consider the government's proposed standard separately in our discussion of aiding and abetting liability. For now we note only that the complaint cannot be sustained on the theory that the defendants themselves committed an act of international terrorism when they donated unspecified amounts of money to Hamas, neither knowing nor suspecting that Hamas would in turn financially support the persons who murdered David Boim. In the very least, the plaintiffs must be able to show that murder was a reasonably foreseeable result of making a donation./10 Thus, the Boims' first theory of liability under section 2333, funding simpliciter of a terrorist organization, is insufficient because it sets too vague a standard, and because it does not require a showing of proximate cause.

B.

The Boims' second theory of liability is that the defendants' violation of sections 2339A and 2339B, the criminal counterparts to section 2333, gives rise to civil liability under section 2333. The Boims further contend that sections 2339A and 2339B demonstrate Congress'

intent to include the provision of material support to terrorist organizations in the definition of international terrorism for the purposes of section 2333. The district court concluded that Congress viewed violations of sections 2339A and 2339B as "activities involving violent acts or acts dangerous to human life," and therefore found that violations of sections 2339A and 2339B gave rise to civil liability under section 2333. Because much of the conduct the Boims alleged occurred before the passage of sections 2339A and 2339B, however, the district court ruled that the Boims would have to rely primarily on their aiding and abetting theory.

In 1994, Congress passed 18 U.S.C. sec. 2339A, which criminalizes the provision of material support to terrorists:

Whoever, within the United States, provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of section 32, 37, 81, 175, 351, 831, 842(m) or (n), 844(f) or (i), 930(c), 956, 1114, 1116, 1203, 1361, 1362, 1363, 1366, 1751, 1992, 2155, 2156, 2280, 2281, 2332, 2332a, 2332b, 2332c, or 2340A of this title or section 46502 of title 49, or in preparation for, or in carrying out, the concealment or an escape from the commission of any such violation, shall be fined under this title, imprisoned not more than 10 years, or both.

18 U.S.C. sec. 2339A(a)./11 "Material support or resources" is a defined term:

In this section, the term "material support or resources" means currency or other financial securities, financial services, lodging, training, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials.

18 U.S.C. sec. 2339A(b). Two years later, Congress extended criminal liability to those providing material support to

foreign terrorist organizations:

Whoever, within the United States or subject to the jurisdiction of the United States, knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 10 years, or both.

18 U.S.C. sec. 2339B(a)(1). Section 2339B adopts the definition of "material support or resources" provided in section 2339A, and looks to 8 U.S.C. sec. 1189 for the definition of "terrorist organization."/12

HLF and QLI, of course, protest the district court's conclusion that funding may form the basis for a section 2333 civil action if the funding meets the standards for criminal liability under sections 2339A or 2339B. The defendants also fault the district court for relying on Congress' repeal of the jurisdictional immunity of a foreign state that has been designated a state sponsor of terrorism as evidence of Congressional intent to allow a section 2333 civil action against persons who violate sections 2339A and 2339B. See 28 U.S.C. sec. 1605(a)(7). HLF and QLI present a number of puzzling arguments against the Boims' theory of civil liability through violations of these criminal statutes. According to HLF and QLI, Congress neither expressly nor impliedly amended the definition of "international terrorism" when it enacted section 2339A and 2339B because (1) these sections set forth criminal offenses separate from the statute making violent acts of international terrorism illegal under U.S. law;/13 (2) these sections provide for relatively minor criminal penalties compared to the penalties for violent terrorist acts; (3) nothing in the text of either sections 2339A or 2339B suggests that violations of these provisions are acts of international terrorism remediable under section 2333; (4) the inclusion of sections 2339A and 2339B in the terrorism section of Title 18 alone does not mean that Congress intended for violations of these provisions to constitute acts of international terrorism for the purposes of section 2333; and (6) section 2339B contains a separate remedial scheme that does not include a private right of

action but instead provides for civil enforcement by the United States. The defendants also argue that even if violations of sections 2339A and 2339B create civil liability under section 2333, the Boims have insufficiently alleged violations of those criminal statutes.

Most of these arguments are tautologous. For example, sections 2339A and 2339B certainly do proscribe different conduct than sections 2332, 2332a, 2332b and 2332d. These latter provisions address the primary perpetrators of violent acts of terrorism, while sections 2339A and 2339B apply to those persons who provide material support to the primary perpetrators of violent acts of terrorism. When it passed sections 2339A and 2339B, Congress undoubtedly intended that the persons providing financial support to terrorists should also be held criminally liable for those violent acts. Indeed, as we have already noted, the Congressional record for section 2333 indicates an intention to cut off the flow of money in support of terrorism generally. S. Rep. 102-342 at 22 (1992). Sections 2339A and 2339B further this goal by imposing criminal liability for financial support of terrorist activities and organizations. The fact that Congress imposed lesser criminal penalties for the financial supporters indicates perhaps that they found the financiers less dangerous or less culpable than the terrorists they finance, but it does not in any way indicate that Congress meant to limit civil liability to those who personally committed acts of terrorism. On the contrary, it would be counterintuitive to conclude that Congress imposed criminal liability in sections 2339A and 2339B on those who financed terrorism, but did not intend to impose civil liability on those same persons through section 2333.

Section 2339A prohibits the provision of material support for an extensive list of violent crimes associated with terrorism--assassination, kidnapping, arson, destruction of aircraft--that make clear what types of conduct Congress had in mind when it defined "international terrorism" in section 2331(1) as not just the violent acts themselves, but also "activities that involve violent acts or acts dangerous to human life." There is no textual, structural or logical

justification for construing the civil liability imposed by section 2333 more narrowly than the corresponding criminal provisions. Because Congress intended to impose criminal liability for funding violent terrorism, we find that it also intended through sections 2333 and 2331(1) to impose civil liability for funding at least as broad a class of violent terrorist acts. If the plaintiffs could show that HLF and QLI violated either section 2339A or section 2339B, that conduct would certainly be sufficient to meet the definition of "in ternational terrorism" under sections 2333 and 2331. Such acts would give rise to civil liability under section 2333 so long as knowledge and intent are also shown, as we shall discuss shortly in the context of aiding and abetting.

We hasten to add that, although proof of a criminal violation under sections 2339A or 2339B might satisfy the definition of international terrorism under section 2333, such proof is not necessary to sustain a section 2333 claim. As we discuss in the context of aiding and abetting, we believe Congress intended for civil liability for financing terrorism to sweep more broadly than the conduct described in sections 2339A and 2339B. We also note that the district court seems to have inadvertently redefined the term "material" in the context of sections 2339A and 2339B as meaning substantial or considerable. The statute itself defines "material support or resources" as "currency or other financial securities, financial services, lodging, training, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials." 18 U.S.C. sec. 2339A(b). Thus, the term relates to the type of aid provided rather than whether it is substantial or considerable. For civil liability, section 2333 requires that the plaintiff be injured "by reason of" the act of international terrorism. Because we believe Congress intended to import standard tort law into section 2333, causation may be demonstrated as it would be in traditional tort law. Congress has made clear, though, through the criminal liability imposed in sections 2339A and 2339B, that even small

donations made knowingly and intentionally in support of terrorism may meet the standard for civil liability in section 2333. Congress' goal of cutting off funding for terrorism would be seriously compromised if terrorist organizations could avoid liability by simply pooling together small donations to fund a terrorist act.

We turn finally to 28 U.S.C. sec. 1605(a)(7). In relevant part, the statute provides:

A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture , extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, agency[.]

Contrary to the defendants' characterization, the district court did not rely solely on the passage of section 1605(a)(7) in finding that Congress viewed the provision of material support and resources as an act of international terrorism. After finding support in both the text and the structure of sections 2333 and 2331 for this proposition, the court found further reasons in section 1605(a)(7). As the district court noted, "Considering that Congress has permitted foreign states that have been designated state sponsors of terrorism to be sued in United States courts for violating sec. 2339A, it is hard to argue that Congress did not intend to include such violations in its definition of 'terrorism' under the statutory scheme." Boim, 127 F. Supp. 2d at 1016. We take the district court to mean that section 1605(a)(7) implies a foreign state may be sued in the United States for acts that would give rise to criminal liability under section 2339A, not that section 2339A itself has a civil provision. The mechanism for suing a foreign state for these acts that would give rise to criminal liability under section 2339A is section 2333. The

defendants complain that Congress did not specifically mention section 2333 as the device by which plaintiffs might sue foreign governments for violations of section 2339A, but they fail to point to any other source of civil liability. We agree that Congress made clear in section 1605(a)(7) its intent to characterize violations of section 2339A as acts of international terrorism under section 2333.

The district court believed there was a timing problem for the Boims in making their case under these criminal provisions because much of the funding conduct allegedly committed by HLF and QLI occurred prior to the passage of sections 2339A and 2339B. Indeed, Hamas was not designated a terrorist organization under section 1189 until 1997, after David's murder. Certainly HLF and QLI could not be held criminally liable for conduct that occurred before the statutes were enacted, but that argument misses the point. We are using sections 2339A and 2339B not as independent sources of liability under section 2333, but to amplify what Congress meant by "international terrorism." Sections 2339A and 2339B merely lend further support to our finding that Congress considered the provision of material support to terrorists an act of international terrorism. This reading simply amplifies the conclusion we have already reached by examining the language and legislative history of section 2333. Sections 2339A and 2339B provide criminal liability for the provision of material support, and section 2333 provides civil liability. The Boims may thus show that QLI and HLF committed an act of international terrorism subject to civil liability under section 2333 by proving that QLI and HLF provided material support to terrorist organizations. No timing problem arises because sections 2339A and 2339B merely elucidate conduct that was already prohibited by section 2333.

C.

We turn next to the Boims' theory that HLF and QLI may be held civilly liable under section 2333 for aiding and abetting an act of international terrorism. Under this theory, the Boims urge us to find that aiding and abetting

a violent act is conduct that "involves" a violent act as that word is used in section 2331(1). HLF and QLI contend that section 2333 does not provide for aiding and abetting liability, and that the Supreme Court in Central Bank held that aiding and abetting liability is available only when a statute expressly provides for it. See Central Bank of Denver N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164 (1994); Alexander v. Sandoval, 532 U.S. 275, 121 S. Ct. 1511 (2001). The Boims counter that neither Central Bank nor Sandoval apply to malum in se torts such as the murder alleged here. The Boims also contend that section 2333 explicitly extends liability to aiders and abettors because it extends civil liability to "activities that involve violent acts . . . that are a violation of the criminal laws of the United States." Because 18 U.S.C. sec. 2 criminalizes aiding and abetting the commission of a felony, the Boims maintain there is no doubt Congress intended to include liability for aiding and abetting in section 2333. The government, in its amicus brief, adds that the language and legislative history of section 2333 indicate an intent by Congress to import into section 2333 civil tort law principles as expressed in the Restatement Second of Torts, and as applied in the cases. Under that jurisprudence, according to the government, aiding and abetting liability should be applied under section 2333, and that result is in no way inconsistent with Central Bank and Sandoval. Because of Central Bank's pivotal importance to our analysis, we will begin by reviewing the Court's reasoning there.

In Central Bank, the Supreme Court held that a private plaintiff may not maintain an aiding and abetting suit under section 10(b) of the Securities Exchange Act of 1934. 511 U.S. at 177-78. As the Court has interpreted it, section 10(b) imposes private civil liability on those who commit a manipulative or deceptive act in connection with the purchase or sale of securities. 511 U.S. at 167. Yet, that section contains no express cause of action giving private plaintiffs a right to sue. Nonetheless, through judicial interpretation of the securities laws, an implied right of action was created allowing private parties to sue for damages for violations of section 10(b).

Prior to Central Bank, some lower courts had interpreted the statute to create a private right of action not only against those who violate section 10(b), but also against those who aid and abet a violation of section 10(b); other courts had found that there was no private right of action for aiding and abetting liability. The Court granted certiorari to resolve the continuing confusion in the circuit courts over the existence and scope of an aiding and abetting action under section 10(b). 511 U.S. at 170.

The securities laws contain a number of provisions creating an extensive scheme of civil liability. The 1933 and 1934 Acts contain express private rights of action, and the courts have also found private rights of actions to be implied by the terms of sections 10(b) and 14(a) of the 1934 Act. 511 U.S. at 171. The SEC adopted Rule 10b-5 to further describe the conduct prohibited, and it is under this rule that plaintiffs often brought their actions. The Court noted that determining the elements of rule 10b-5 private action claims had posed difficulty because Congress had not expressly provided for a private 10(b) action and thus had no occasion to offer guidance about the elements of a private liability scheme. 511 U.S. at 172. The courts thus had to infer how the 1934 Congress would have addressed the issue had the 10b-5 action been included as an express provision of the 1934 Act. 511 U.S. at 173. Because adherence to the statutory language is the starting point of any case involving construction of a statute, the Supreme Court refused to allow 10b-5 liability for conduct not prohibited by the text of section 10(b). 511 U.S. at 174. In view of the fact that section 10(b) made no mention of aiding and abetting liability, the Court found that there could be no private right of action for aiding and abetting a 10(b) violation.

The Court rejected a claim that language in the statute imposing liability on any person who "directly or indirectly" employs a deceptive practice meant that Congress intended to cover aiding and abetting:

The problem, of course, is that aiding and abetting liability extends beyond persons who engage, even indirectly, in a

proscribed activity; aiding and abetting liability reaches persons who do not engage in the proscribed activities at all, but who give a degree of aid to those who do.

511 U.S. at 175-76. Citing section 876(b) of the Restatement (Second) of Torts, the Court acknowledged that aiding and abetting a wrongdoer ought to be actionable in certain other circumstances, but the issue here was whether aiding and abetting was covered by the statute. The Court stated that it was inconsistent with settled methodology in section 10(b) cases to extend liability beyond the scope of conduct prohibited by the statutory text. The Court found that the statute prohibited only the making of a material misstatement (or omission) or the commission of a manipulative act. Because the statute did not proscribe giving aid to a person who commits a manipulation or deceptive act, the Court declined to extend liability to aiders and abettors. 511 U.S. at 177-78.

The Court further noted that it could reach the same result by examining the express causes of action identified in the 1933 and 1934 Acts as models for implied rights of action under those same sections. None of the express causes of actions in the 1934 Act imposed liability on aiders and abettors, and the Court found it would be "anomalous to impute to Congress an intention in effect to expand the defendant class for 10b-5 actions beyond the bounds delineated for comparable express causes of action." 511 U.S. at 180. This analysis was bolstered by the conclusion that an action against aiders and abettors would allow liability when at least one element critical for recovery under rule 10b-5 is absent: reliance. Id. An aiding and abetting action would allow a defendant to be held liable without the usual requisite showing that the plaintiff relied on the defendant's statements or actions, in contravention of the careful limits on 10b-5 recovery mandated by earlier cases. Id.

The Court also examined the history of aiding and abetting liability, noting first that Congress enacted 18 U.S.C. sec. 2, a general aiding and abetting statute applicable to all federal crimes,

in 1909. The statute provides that persons who provide knowing aid to those committing federal crimes, with the intent to facilitate the crime, are themselves committing a crime. 511 U.S. at 181. The Restatement (Second) of Torts similarly provides for civil liability for aiders and abettors by holding an actor liable for harm resulting to a third person from the tortious conduct of another if the actor knows the other's conduct constitutes a breach of duty and the actor gives substantial assistance or encouragement to the other. Restatement (Second) of Torts, sec. 876(b). But Congress did not enact a general aiding and abetting statue covering civil actions, either for suits by the government or suits by private parties.

Thus, when Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors.

Central Bank, 511 U.S. at 182.

Instead, the Court found, Congress had taken a statute-by-statute approach to civil aiding and abetting liability. In sum, the Court found that there was no reason to attach aiding and abetting liability in all federal civil statutes, that Congress had not expressed any intent to extend aiding and abetting liability in this particular statute, and that none of the express causes of action in the 1934 Act extended aiding and abetting liability. Even considering the history of aiding and abetting liability in the criminal and the civil context, the Court found no reason to extend that liability to private causes of action in the securities statutes. Indeed, Congress had expressly provided for another type of secondary liability in the 1934 Act-- "controlling person" liability--and thus the absence of aiding and abetting liability appeared to have been a deliberate choice. 511 U.S. at 183-84.

The Central Bank analysis provides guidance but is not determinative here for a number of reasons. First, Central Bank addressed extending aiding and abetting liability to an implied right of action, not an express right of action as

we have here in section 2333. Second, Congress expressed an intent in the terms and history of section 2333 to import general tort law principles, and those principles include aiding and abetting liability. Third, Congress expressed an intent in section 2333 to render civil liability at least as extensive as criminal liability in the context of the terrorism cases, and criminal liability attaches to aiders and abettors of terrorism. See 18 U.S.C. sec. 2. Fourth, failing to extend section 2333 liability to aiders and abettors is contrary to Congress' stated purpose of cutting off the flow of money to terrorists at every point along the chain of causation.

Although we have found no support in the cases for the Boims' argument that Central Bank does not apply to malum in se torts, we also have found no support for the defendants' claim that Central Bank eliminates all aiding and abetting liability in federal civil cases except when the words "aid and abet" appear in a statute./14 The Court care-fully crafted Central Bank's holding to clarify that aiding and abetting liability would be appropriate in certain cases, albeit not under 10(b). Central Bank, 511 U.S. at 177. The first significant factor distinguishing section 2333 from section 10(b) is that section 2333 provides for an express civil right of action by private parties whereas the courts have created an implied right of action under section 10(b). Thus, the courts were already inferring an intent by Congress to create a private civil cause of action with section 10(b), and they would have been stacking another inference on top of that one in extending liability to aiders and abettors in rule 10b-5 actions. The Court was understandably reluctant to pile inference upon inference in determining Congressional intent. But no such stacking is required in section 2333, which expressly creates a private right of action for plaintiffs who are injured by reason of an act of international terrorism. Sandoval is distinguishable for the very same reason; it addressed an implied right of action founded on a regulation promulgated under Title VI. Here we have an express private right of action, where Congress' intent is clear from the language and structure of the statute itself as well as from the legislative history. As we will discuss

below, although the words "aid and abet" do not appear in the statute, Congress purposely drafted the statute to extend liability to all points along the causal chain of terrorism. It is not much of a leap to conclude that Congress intended to extend section 2333 liability beyond those persons directly perpetrating acts of violence. Indeed, the statute itself defines international terrorism so broadly--to include activities that "involve" violent acts--that we must construe it carefully to meet the constitutionalstandards regarding vagueness and First Amendment rights of association.

   The next distinguishing factor is that the language and legislative history of section 2333 evidence an intent to import general tort law principles into the statute, a factor glaringly absent from section 10(b). See 137 Cong. Rec. S4511-04 (April 16, 1991); Senate Hearing at 136. Nothing in section 10(b) reflects an intent to incorporate general tort law principles, and a careful review of that statute demonstrates to the contrary that Congress intended to limit liability in certain instances. As the Supreme Court noted, Congress imposed some forms of secondary liability in section 10(b) (such as controlling person liability), but not others, manifesting a deliberate choice to exclude aiding and abetting liability. In contrast, the language of section 2333 tracks the traditional elements of tort law as expressed in the Restatement, and the legislative history expressly references tort principles in setting out the perimeters of Congress' intent.

   Unlike section 10(b), Congress also expressed an intent in section 2333 to make civil liability at least as extensive as criminal liability. The statute defining "international terrorism" includes activities that "involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State." 18 U.S.C. sec. 2331(1). This language, embracing activities that "involve" violent acts, taken at face value would certainly cover aiding and abetting violent acts. Remember, too, the

criminal laws include 18 U.S.C. sec. 2, which creates liability for aiding and abetting violations of any other criminal provisions. By incorporating violations of any criminal laws that involve violent acts or acts dangerous to human life, Congress was expressly including aiding and abetting to the extent that aiding and abetting "involves" violence. As we discussed earlier, "involve" is a rather broad word. If we were to interpret "involve" literally, we would be attributing almost unlimited liability to any act that had some link to a terrorist act. Congress could not have meant to attach unlimited liability to even remote acts; it must have meant something else. As we have seen from the language and legislative history of section 2333, that something else is traditional tort and criminal liability. Aiding and abetting, which is surely subsumed in the definition of acts that "involve" certain criminal violations, is a well known and well defined doctrine. See Damato v. Hermanson, 153 F.3d 464, 472 n.10 (7th Cir. 1998) (in the criminal context, the aider and abettor knowingly assists the principal in the attainment of the illegal objective and therefore is sanctioned as the principal); United States v. Zafiro, 945 F.2d 881, 887 (7th Cir. 1991), aff'd, 506 U.S. 534 (1993) (the crime of aiding and abetting requires knowledge of the illegal activity that is being aided and abetted, a desire to help that activity succeed, and some act of helping). See also Halberstam v. Welch, 705 F.2d 472, 477and 481-84 (D.C. Cir. 1983) (setting forth the elements for civil liability for aiding and abetting). That Congress did not use the words "aid and abet" in the statute is not determinative when it did use words broad enough to include all kinds of secondary liability. See Harris Trust, 530 U.S. at 246 (holding that ERISA reaches farther than the immediate wrongdoer because the statute focuses not on the class of possible defendants but rather on redressing a particular act or practice which violates the statute). Indeed, limiting the term "involve" to the familiar definitions of aiding and abetting (or even conspiracy, for that matter) provides the necessary clarification that saves the statute from vagueness. Central Bank is thus distinguishable on this ground as well.

Finally, if we failed to impose liability on aiders and abettors who knowingly and intentionally funded acts of terrorism, we would be thwarting Congress' clearly expressed intent to cut off the flow of money to terrorists at every point along the causal chain of violence. S. Rep. 102-342, at 22 (by imposing "liability at any point along the causal chain of terrorism, it would interrupt, or at least imperil, the flow of money."). Unlike section 10(b) where Congress' intent could be met without imposing liability on aiders and abettors, Congress' purpose here could not be met unless liability attached beyond the persons directly involved in acts of violence. The statute would have little effect if liability were limited to the persons who pull the trigger or plant the bomb because such persons are unlikely to have assets, much less assets in the United States, and would not be deterred by the statute. See Central Bank, 511 U.S. at 188 (policy considerations may be used to interpret the text and structure of a statute when a literal reading would lead to a result so bizarre that Congress could not have intended it). Also, and perhaps more importantly, there would not be a trigger to pull or a bomb to blow up without the resources to acquire such tools of terrorism and to bankroll the persons who actually commit the violence. Moreover, the organizations, businesses and nations that support and encourage terrorist acts are likely to have reachable assets that they wish to protect. The only way to imperil the flow of money and discourage the financing of terrorist acts is to impose liability on those who knowingly and intentionally supply the funds to the persons who commit the violent acts. For all of these distinguishing reasons, we do not think Central Bank controls the result here, but that aiding and abetting liability is both appropriate and called for by the language, structure and legislative history of section 2333.

D.

The defendants raise two First Amendment objections to this section 2333 action against them. First, they argue that the Boims seek to hold them liable for their mere association with Hamas. Harking back to a line of cases involving the Communist party, HLF and QLI contend

that, when an organization has both legal and illegal aims, a person may not be punished for mere membership in or association with that organization, but may be held civilly liable only if he or she possesses the specific intent to further the organizations' illegal purposes. Second, they contend that, to the extent the Boims' claim is founded on a violation of section 2339B, it cannot withstand First Amendment scrutiny because section 2339B fails to account for the intent and the associational rights of the contributors who donate money for humanitarian purposes. The National Coalition to Protect Political Freedom and the Center for Constitutional Rights have jointly filed an amicus brief in support of the defendants' First Amendment arguments, and we will consider their contentions as well.

1.

HLF and QLI begin their argument with the well-established proposition that the Constitution protects against the imposition of liability based solely upon association with a group. See NAACP v. Claiborne Hardware Co., 458 U.S. 886, 920 (1982) ("[c]ivil liability may not be imposed merely because an individual belonged to a group, some members of which committed acts of violence."); Healy v. James, 408 U.S. 169, 185-86 (1972) ("the Court has consistently disapproved governmental action imposing criminal sanctions or denying rights and privileges solely because of a citizen's association with an unpopular organization."); United States v. Robel, 389 U.S. 258, 265 (1967) (where a statute establishes guilt by association alone, the inhibiting effect on First Amendment rights is clear); Scales v. United States, 367 U.S. 203, 229 (1961) (a blanket prohibition of association with a group having both legal and illegal aims presents a real danger that legitimate political expression or association would be impaired). We have no quarrel with that general proposition or with its corollary, that in order to impose liability on an individual for association with a group, it is necessary to establish that the group possessed unlawful goals and that the individual held a specific intent to further those illegal aims. Claiborne Hardware, 458 U.S. at 920-21; National Organization for

Women, Inc. v. Scheidler, 267 F.3d 687, 703 (7th Cir. 2001), cert. granted, 122 S. Ct. 1604 and 122 S. Ct. 1605 (2002).

HLF and QLI protest that the Boims have not alleged their specific intent to further the illegal activities of Hamas, and that the claim does not, therefore, survive First Amendment scrutiny. Rather, HLF complains, the Boims have simply alleged that HLF has admitted providing funds to Hamas, that HLF functions as a front organization for Hamas, that HLF raises and channels funds to Hamas to finance terrorist activities in Israel, and that HLF solicits donations over the internet. HLF protests that even if these allegations suffice to show a present intent to further terrorist acts, they do not show that HLF had that intent prior to David Boim's murder. Rather, HLF believes the Boims are lumping their organization in with other groups that may have had an intent to commit illegal acts, and that the Boims are seeking to hold them liable for their mere association with these other organizations. QLI similarly argues that the Boims have not alleged a specific intent on the part of QLI to further the illegal goals of Hamas, and that they may not be held liable for merely associating with organizations that might have intended to aid the illegal operations of Hamas.

Amici also emphasize that individuals may not be penalized for their association with a political organization that engages in both lawful and unlawful ends, absent a showing of specific intent to further the organization's illegal goals. Claiborne Hardware, 458 U.S. at 919-20. The arguments of the defendants and amici beg the question, though, because section 2333 does not seek to impose liability for association alone but rather for involvement in acts of international terrorism. The defendants nonetheless object that the definition of acts of international terrorism is so broad that they might be held liable for involvement in terrorist activity when all they intended was to supply money to fund the legitimate, humanitarian mission of Hamas or other organizations. To resolve the tension that arises when a group engages in both protected advocacy and unprotected criminal acts, we look to Claiborne Hardware and to earlier cases

that arose out of the McCarthy era, when the government sought to impose liability on persons for their association with the Communist Party.

In Claiborne Hardware, a group of white merchants and business owners sued the National Association for the Advancement of Colored People ("NAACP") for engaging in a boycott of white-owned businesses. The merchants alleged that, in enforcing the boycott, some of the members of the defendant NAACP had engaged in acts of physical force and violence, and that the NAACP should therefore be held liable for the merchants' losses. The Court first held that speeches and nonviolent picketing in support of the boycott were activities normally entitled to protection under the First Amendment. 458 U.S. at 907. The Court noted that the right of association, the right to join many voices together to strengthen a message and make certain it is heard, is an important constitutional guarantee. 458 U.S. at 908. That right "to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advanced doctrine that is itself not protected." 458 U.S. at 908. At the same time, "[t]he First Amendment does not protect violence." 458 U.S. at 916.

Certainly violence has no sanctuary in the First Amendment, and the use of weapons, gunpowder, and gasoline may not constitutionally masquerade under the guise of "advocacy."

Claiborne Hardware, 458 U.S. at 916 (quoting Samuels v. Mackell, 401 U.S. 66, 75 (1971) (Douglas, J., concurring)). The Court concluded that no federal rule of law restricts a state from imposing tort liability for business losses caused by violence or the threat of violence, but that when such conduct occurs in the context of constitutionally protected activity, precision of regulation is required. Claiborne Hardware, 458 U.S. at 916. When activity protected by the First Amendment is present, damages are restricted to the direct consequences of the illegal violent conduct and may not include the consequences resulting from associated peaceful picketing or other protected First Amendment activity. 458 U.S. at 918 (citing United Mine Workers

of America v. Gibbs, 383 U.S. 715, 729 (1966)). Citing Scales, Healy and Noto, the Court summarized the rule to be applied:

Civil liability may not be imposed merely because an individual belonged to a group, some members of which committed acts of violence. For liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims.

Claiborne Hardware, 458 U.S. at 920.

We have already held that the Boims may prevail on their claim by showing, among other things, that the defendants aided and abetted David's murder. This requires them to prove that the defendants knew of Hamas' illegal activities, that they desired to help those activities succeed, and they engaged in some act of helping the illegal activities. See Zafiro, 945 F.2d at 887. If the Boims are able to prove the defendants aided and abetted terrorist acts, liability would not offend the principles announced in Claiborne Hardware. The Boims have alleged that HLF and QLI supplied money to Hamas to fund terrorist operations, that they are "front" organizations with ostensibly legitimate purposes which are actually engaged in fund-raising and money laundering in support of terrorist activities. They have alleged that HLF and QLI provided the money to purchase the weapons and train the men who killed David Boim. HLF and QLI, of course, deny these allegations and argue that as a factual matter, Hamas is primarily a humanitarian organization, and that any money supplied to Hamas by QLI and HLF was intended to fund humanitarian efforts, not terrorism. This is a classic factual dispute, not suitable for resolution on a motion to dismiss for failure to state a claim. If the Boims are able to prove their allegations, that HLF and QLI provided legitimate-looking fronts for raising money to support the terrorist operation that resulted in David Boim's murder, their claim will not run afoul of the First Amendment. The Boims are not seeking to hold HLF and QLI liable for their mere association with Hamas, nor are they seeking to hold the defendants liable for contributing money

for humanitarian efforts. Rather, they are seeking to hold them liable for aiding and abetting murder by supplying the money to buy the weapons, train the shooters, and compensate the families of the murderers. That Hamas may also engage in legitimate advocacy or humanitarian efforts is irrelevant for First Amendment purposes if HLF and QLI knew about Hamas' illegal operations, and intended to help Hamas accomplish those illegal goals when they contributed money to the organization. Claiborne Hardware, 458 U.S. at 932; Scales, 367 U.S. at 229; Noto, 367 U.S. at 298; Healy, 408 U.S. at 186; Scheidler, 267 F.3d at 703.

Moreover, we believe the Boims' allegations lend adequate support to their claims against QLI and HLF. Rule 8(a) requires only a short and plain statement of the claim showing that the Boims are entitled to relief. The defendants repeatedly confuse what must be alleged with what must be proved. The plaintiffs need not set out in detail all of the facts upon which they base their claim. They need only give QLI and HLF fair notice of what their claim is and the grounds upon which it rests. Leatherman, 507 U.S. at 168. This they have done.

They allege that QLI and HLF violated section 2333 by aiding and abetting Hinawi and Al-Sharif in committing the murder of David Boim. An aiding and abetting claim will require the Boims to prove that QLI and HLF knew about Hamas' illegal operations and provided aid to Hamas with the intent to facilitate those illegal activities. In support of the claim that HLF and QLI aided and abetted the terrorists who murdered David, the Boims allege that HLF and QLI were engaged in raising and laundering money for Hamas; that HLF and QLI functioned as fronts for Hamas in the United States; that HLF raised and channeled funds to Hamas to finance terrorist activities in Israel; that David's attackers were Hamas terrorists; that Hamas' central purpose is to advance its political goals through terrorism; that HLF and QLI's purportedly humanitarian functions masked their core mission of raising and funneling money and other resources to Hamas in support of its terrorist campaigns; that HLF and QLI comingled money destined for terrorist causes with funds from their

legitimate charitable and business dealings in order to avoid laws against providing financial support to terrorists; that money gathered in this way was sent by the front organizations (including HLF and QLI) from the United States to Hamas to buy weapons and carry out terrorist attacks, including the murder of David Boim; and that money provided by the front organizations to finance terrorist activities was in fact used for that purpose and in particular was used to purchase the vehicle, machine guns, and ammunition used to kill David, as well as to train his killers and to provide a stipend for the family of one of his murderers. That is more than sufficient to notify the defendants of the nature of the claims against them. These allegations also implicitly assert that the defendants had the intent to further the illegal aims of Hamas prior to David's murder, contrary to the defendants' characterization. The Boims' theory of the case, that QLI and HLF aided and abetted Hamas in murdering David Boims, does not offend the First Amendment because they seek to hold QLI and HLF liable not for their associations or speech but for their knowing and intentional financial support of illegal activities. We also note that discovery will certainly clarify the Boims' theory of the case, and we will not dismiss a complaint before discovery unless it appears beyond doubt that the Boims can prove no set of facts in support of their claim which would entitle them to relief. Slaney, 244 F.3d at 597. Although the defendants claim to have been supporting only the humanitarian mission of Hamas, that is a fact question that cannot be resolved at this early stage of the litigation.

2.

We turn next to the defendants' contention that any section 2333 claim founded on a violation of section 2339B must fail because section 2339B violates the First Amendment. As we noted above, section 2339B subjects to criminal liability anyone who, within the United States or subject to the jurisdiction of the United States, knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so. 18 U.S.C. sec. 2339B(a)(1). The defendants complain

that, because section 2339B imposes liability without regard to the intent of the donor, it violates the First Amendment. They maintain that section 2339B unnecessarily interferes with the associational rights of contributors who donate money solely for humanitarian purposes by failing to limit liability to those who intend to support the illegal goals of an organization. They contend that section 2339B will chill legitimate fund-raising for humanitarian purposes if a charitable organization could be prosecuted for providing food for the needy in the Middle East that happens to make its way into the mouths of the families of terrorists. They urge us to reject the reasoning of the Ninth Circuit in Humanitarian Law Project v. Reno, 205 F.3d 1130 (9th Cir. 2000), cert. denied, 532 U.S. 904 (2001), in upholding the constitutionality of section 2339B against a First Amendment challenge. They argue that Humanitarian Law Project is inconsistent with Claiborne Hardware, and that even if it is not, it is factually distinguishable from the instant case.

These arguments miss the mark because the constitutionality of section 2339B is not before us. The defendants have not been charged with a criminal violation of section 2339B. As we discussed above, section 2339B is relevant to the Boims' claim only to the extent that it helps define what conduct Congress intended to include in its definition of "international terrorism." Section 2339B provides further support to the Boims' theory that Congress meant to include funding terrorism as an act "involving" violence. It is the constitutionality of section 2333 that concerns us today, and as we have just found, funding that meets the standard for aiding and abetting terrorist acts does not offend the First Amendment. We take the defendants' argument to be that a section 2333 claim founded solely on conduct that would render a person criminally liable under section 2339B would violate the First Amendment. With this refinement to the question, we turn to the Ninth Circuit's analysis of section 2339B.

The plaintiffs in Humanitarian Law Project were organizations and individuals who wished to provide money to two groups that had been designated as foreign terrorist organizations under 8

U.S.C. sec. 1189. They sought a preliminary injunction barring enforcement of section 2339B against them, and maintained that they intended only to support the nonviolent humanitarian and political activities of the designated groups. They argued, as HLF and QLI do here, that 2339B violates the First Amendment because it imposes liability on persons who provide material support to terrorist organizations regardless of whether the donor intends to further the unlawful goals of the organization. The plaintiffs relied on Claiborne Hardware for the proposition that "[f]or liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims." Humanitarian Law Project, 205 F.3d at 1133 (quoting Claiborne Hardware, 458 U.S. at 920).

Claiborne Hardware and the similar cases we have discussed supra apply to situations where the government seeks to impose liability on the basis of association alone, i.e., on the basis of membership alone or because a person espouses the views of an organization that engages in illegal activities. Conduct giving rise to liability under section 2339B, of course, does not implicate associational or speech rights. Humanitarian Law Project, 205 F.3d at 1133. Under section 2339B, and indeed under section 2333, HLF and QLI may, with impunity, become members of Hamas, praise Hamas for its use of terrorism, and vigorously advocate the goals and philosophies of Hamas. Section 2339B prohibits only the provision of material support (as that term is defined) to a terrorist organization. There is no constitutional right to provide weapons and explosives to terrorists, nor is there any right to provide the resources with which the terrorists can purchase weapons and explosives. 205 F.3d at 1133.

Advocacy is always subject to the highest levels of scrutiny under the First Amendment, but donations are not always equivalent to advocacy and are subject to greater government regulation. In Buckley v. Valeo, 424 U.S. 1 (1976), the Supreme Court upheld the $1000 limit on political contributions to candidates for federal offices by individual donors.

The Court acknowledged the expressive element of a contribution to a political campaign, noting that a contribution serves as a general expression of support for a candidate and the candidate's views, but does not communicate the underlying basis for the support. 424 U.S. at 21. Because the expression involved in donating money "rests solely on the undifferentiated, symbolic act of contributing," the size of the donation provides only a very rough estimate of the intensity of the contributor's support for the candidate. 424 U.S. at 21. The Court concluded that a limitation on the amount of money a person may contribute thus involved little direct restraint on the donor's political communication. Any size contribution will permit a symbolic expression of support, but a limitation on the size does not infringe the contributor's freedom to discuss issues. The Court acknowledged that the funds might be used by the candidate to present views to voters, but "the transformation of contributions into political debate involves speech by someone other than the contributor." 424 U.S. at 21. The Court found that associational interests were also implicated because making a contribution affiliates a person with a candidate, and enables like-minded people to pool their resources to further political goals. 424 U.S. at 22. Setting the standard for reviewing governmental regulation in this context, the Court held that "[e]ven a significant interference with protected rights of political association may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgement of associational freedoms." 424 U.S. at 25 (internal quote marks omitted).

Applying the Buckley standard to section 2333 claims founded on conduct that would give rise to criminal liability under section 2339B, we conclude that the government's interest in preventing terrorism is not only important but paramount. Humanitarian Law Project, 205 F.3d at 1135. Although that interest has been made all the more imperative by the events of September 11, 2001, the terrorist threat to national security was substantial in 1992 when Congress passed section 2333 and in 1996 when Congress passed section 2339B. That interest is

unrelated to suppressing free expression. A section 2333 suit founded on conduct violating section 2339B does not punish membership in a designated terrorist organization, or penalize the expression of views held by these organizations. Rather, such a suit is aimed at prohibiting the funding of violent acts that these organizations wish to carry out. 205 F.3d at 1135.

The only remaining question is whether a section 2333 action based on conduct that violates section 2339B employs means closely drawn to avoid unnecessary abridgement of associational freedoms. Section 2339B forbids the provision of any amount of "material support or resources" to a foreign terrorist organization. "Material support or resources" includes, among other things, money, training, weapons, lethal substances, explosives and personnel. Congress determined that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." Pub. L. 104-132, Section 301. Terrorist organizations use funds for illegal activities regardless of the intent of the donor, and Congress thus was compelled to attach liability to all donations to foreign terrorist organizations. In order to be designated a terrorist organization, a group must engage in terrorist activity that threatens the security of United States nationals or the national security of the United States. 8 U.S.C. sec. 1189(a). "Terrorist activity" is defined, in relevant part, as unlawful activity which involves any of the following: the hijacking or sabotage of any aircraft, vessel or vehicle; the seizing, detaining or threatening to kill, injure or continue detaining an individual in order to compel a third person to do or abstain from doing any act as a condition for the release of the individual detained; a violent act upon an internationally protected person; an assassination; the use of any biological agent, chemical agent, nuclear weapon or device, or explosive or firearm, with intent to endanger the safety of one or more individuals or cause substantial damage to property. 8 U.S.C. sec. 1182(a)(3)(B)(ii). Given the stringent requirements that must be met before a

group is designated a foreign terrorist organization, Congress carefully limited its prohibition on funding as narrowly as possible in order to achieve the government's interest in preventing terrorism. We note that Congress did not attach liability for simply joining a terrorist organization or zealously espousing its views. By prohibiting funding alone, Congress employed means closely drawn to avoid unnecessary abridgement of associational freedoms. A section 2333 action founded on conduct violating section 2339B is sufficiently tailored to achieve an important government interest and does not run afoul of the First Amendment. Humanitarian Law Project, 205 F.3d at 1136.

III.

In short, we answer the three questions certified by the district court as follows: funding, simpliciter, of a foreign terrorist organization is not sufficient to constitute an act of terrorism under 18 U.S.C. sec. 2331. However, funding that meets the definition of aiding and abetting an act of terrorism does create liability under sections 2331 and 2333. Conduct that would give rise to criminal liability under section 2339B is conduct that "involves" violent acts or acts dangerous to human life, and therefore may meet the definition of international terrorism as that term is used in section 2333. Finally, as we have set forth the elements of an action under section 2333, civil liability for funding a foreign terrorist organization does not offend the First Amendment so long as the plaintiffs are able to prove that the defendants knew about the organization's illegal activity, desired to help that activity succeed and engaged in some act of helping. The plaintiffs have not yet had an opportunity to develop the facts of their case. Today we hold that dismissal would be premature at this stage of the litigation because we can envision a set of facts in support of the claim they have alleged that would entitle them to relief.

AFFIRMED.

FOOTNOTES

/1 Exec. Order No. 12947, 60 Fed. Reg. 5079 (January 23, 1995). President Clinton invoked 50 U.S.C. sec. 1701, et seq. (the International Emergency Economic Powers Act), 50 U.S.C. 21 1601 et seq. (the National Emergencies Act), and 3 U.S.C. sec. 301 (authorizing the President to delegate certain functions) to label Hamas and eleven other groups as "terrorist organizations which threaten to disrupt the Middle East peace process."

/2 Section 1189 provides a procedure by which the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, may designate certain organizations as "foreign terrorist organizations." In order to be so designated, a foreign organization must "engage in terrorist activity" as defined in 8 U.S.C. sec. 1182(a)(3)(B). "Terrorist activities" include a number of illegal acts such as sabotaging or highjacking a vessel, aircraft or vehicle; detaining a person and threatening to kill, injure or further detain that person in order to compel a third person to do something; violently attacking an internationally protected person; assassinating any person; using a biological agent, chemical agent, nuclear device, explosive or firearm with intent to endanger the safety or one or more persons or to cause substantial damage to property; or threatening, attempting or conspiring to do any of these things. 8 U.S.C. sec. 1882(a)(3)(B)(ii). "Engage in terrorist activity" is further defined to include providing material support to anyone conducting a terrorist act, where material support includes: preparation and planning of a terrorist activity; gathering of information on potential targets for terrorist activity; providing a safe house, transportation, communications, funds, false documentation or identification, weapons, explosives, or training to any individual the actor knows or has reason to believe has committed or plans to commit a terrorist activity; soliciting funds or other things of value for any terrorist organization; or soliciting any individual for membership in a terrorist organization or to engage in terrorist activity. 8 U.S.C. sec. 1182(a)(3)(B)(iii). Afternotifying Congress of the designation, the Secretary of the Treasury may require United States financial institutions to freeze the assets of a foreign terrorist organization. The statute provides that Congress may revoke the designation in certain circumstances and also provides that any foreign terrorist organization may seek judicial review of the designation. 8 U.S.C. sec. 1189.

/3 The United States has proceeded against Salah and Mousa Mohammed Abu Marzook in an unrelated action to seize funds used in terrorism. See United States v. One 1997 E35 Ford Van VIN

1FBJS31L3VHB70844, 50 F. Supp. 2d 789 (N.D. Ill. 1999). In that action, the United States has alleged that Salah and Marzook employed a number of charitable organizations in the United States to raise and launder money for Hamas. The FBI presented evidence in that action that Salah actively recruited Hamas terrorists, arranged for and financed their training, served as a financial conduit for Hamas operations directed from the U.S., paid for plane tickets to transport terrorists from the U.S. to the Middle East, and gave approximately $100,000 to another Hamas operative for the express purpose of procuring weapons.

/4 According to the Boims, Marzook has admitted in an extradition proceeding filed against him that he is the leader of the political wing of Hamas and he has raised money for Hamas. Evidence presented in his extradition proceeding established that he transferred funds to Salah, recruited Salah to raise funds for the Hamas military activities, knew that Hamas operatives were carrying out terrorist activities in Israel, and gave one of the organizers of these terrorist activities a book of blank, signed checks to fund Hamas operations. The United States has also proceeded against Marzook in the Ford Van forfeiture action referenced in note 3, supra.

/5 The Boims also argued in the district court that Congress clarified section 2331(1) in its later passage of sections 2339A and 2339B. According to the Boims, Congress demonstrated in sections 2339A and 2339B that the provision of material support or resources to terrorists is an activity that involves violent acts or acts dangerous to human life. The Boims' argument on this point is thus two-fold: first, they claim that violations of sections 2339A and 2339B give rise to civil liability under section 2333. Second, they maintain that sections 2339A and 2339B clarify the meaning of "involve" in section 2331(1). In particular, sections 2339A and 2339B demonstrate that providing material support or resources is an activity that "involves" violent acts. We will address both prongs of the Boims' argument infra.

/6 Sections 2331 and 2333 were initially enacted in 1990 as the Anti-Terrorism Act of 1990, Pub. L. No. 101-519, sec. 132, 104 Stat. 2250 (1990), but were repealed as the result of a technical deficiency. They were subsequently re-enacted as part of the Federal Courts Administration Act of 1992, Pub. L. No. 102-572, 106 Stat. 4506 (1992).

/7 Because the questions presented in the appeal implicate, at least in part, the relation between section 2333 and two criminal statutes, sections 2339A and 2339B, we asked the United States to

file a brief amicus curiae. The United States accepted our invitation and the plaintiffs and defendants were afforded an opportunity to respond to the views presented by the United States.

/8 A few courts, however, have touched on the application of the term "international terrorism" in the context of FISA. See United States v. Sarkissian, 841 F.2d 959, 965 (9th Cir. 1988) (investigation of "international terrorism" by definition requires investigation of activities that constitute crimes); United States v. Duggan, 743 F.2d 59 (2d Cir. 1984) (asking a court to apply the definition of "international terrorism" does not embroil the court in a political question and thereby violate the separation of powers doctrine).

/9 One of Mr. Klinghoffer's surviving daughters testified before both the House and the Senate in favor of the passage of the Antiterrorism Act of 1990. See Senate Hearing; H.R. Rep. 102-1040 at 4.

/10 The defendants have also argued that Congress listed exhaustively in section 2333(b) all of the offenses which could give rise to liability under section 2333(a). We reject this contention because "international terrorism" is a defined term that includes conduct much broader than the offenses listed in section 2333(b). See 18 U.S.C. sec. 2331. Reading the statute as the defendants urge would require us to disregard Congress' express definition of the term "international terrorism."

/11 The crimes covered by this diverse and extensive list include, in Title 18: sec. 32, destruction of aircraft or aircraft facilities; sec. 37, violence at international airports; sec. 81, arson within special maritime and territorial jurisdiction; sec. 175, prohibitions with respect to biological weapons; sec. 351, Congressional, Cabinet, and Supreme Court assassination, kidnapping, and assault; sec. 831, prohibited transactions involving nuclear materials; sec. 842(m), importing and exporting certain plastic explosives; sec. 842(n), shipping, transporting, transferring, receiving or possessing certain plastic explosives; sec. 844(f), maliciously damaging or destroying personal or real property belonging to the United States; sec. 844(i), maliciously damaging or destroying personal or real property used in interstate or foreign commerce; sec. 930(c), killing or attempting to kill a person in a federal facility while illegally possessing a firearm or other dangerous weapon in that facility; sec. 956, conspiracy to kill, kidnap, maim, or injure persons or damage

property in a foreign country; sec. 1114, protection of officers and employees of the United States; sec. 1116, murder or manslaughter of foreign officials, official guests or internationally protected persons; sec. 1203, hostage taking; sec. 1361, injuries to government property or contracts; sec. 1362, injury to communication lines, stations or systems; sec. 1363, damaging buildings or property within the special maritime and territorial jurisdiction; sec. 1366, destruction of an energy facility; sec. 1751, Presidential and Presidential staff assassination, kidnapping, and assault; sec. 1992, wrecking trains; sec. 2155, destruction of national defense materials, premises or utilities; sec. 2156, production of defective national defense material, premises or utilities; sec. 2280, violence against maritime navigation; sec. 2281, violence against maritime fixed platforms; sec. 2332, killing of a United States national outside the United States; sec. 2332a, use of certain weapons of mass destruction; sec. 2332b, acts of terrorism transcending national boundaries; or sec. 2340A, torture outside the United States. Section 2332c has been repealed. Title 49, sec. 46502 prohibits aircraft piracy.

/12 See note 2, supra.

/13 Presumably, they are referring to 18 U.S.C. secs. 2332, 2332a, 2332b and 2332d. These sections proscribe murder, physical violence, the use of weapons of mass destruction, acts of terrorism transcending national boundaries, and engaging in financial transactions with designated terrorist countries. These provisions apply to the person directly engaged in the prohibited activity, as opposed to persons providing material support to those directly engaged in the prohibited activity.

/14 The Fourth Circuit, in Rice v. Paladin Enterprises, Inc., 128 F.3d 233, 252-53 (4th Cir. 1997), considered the First Amendment implications of a civil suit seeking to hold liable the publishers of a book for a murder committed by a reader. The book, entitled "Hit Man: A Technical Manual for Independent Contractors," detailed how to commit murder-for-hire, and the publisher stipulated that it both knew and intended that its readers would use the book to commit murder. Under those circumstances, the court held that liability for aiding and abetting a malum in se crime such as murder via speech intended to assist and encourage others in that crime would not run afoul of the First Amendment. Although the Rice court did not expressly reference Central Bank, its holding is consistent with the Boims' reading of that case.