**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LAWRENCE FREEMAN; MICHAEL
SCHERER, on behalf of themselves
and all persons similarly situated,
              *Plaintiffs-Appellants,*

              v.

DIRECTV, INC.; ICG, INC.,
              *Defendants-Appellees.*

No. 04-56500

D.C. No.
CV-04-02374-RGK

OPINION

Appeal from the United States District Court
for the Central District of California
R. Gary Klausner, District Judge, Presiding

Argued and Submitted
June 6, 2006—Pasadena, California

Filed August 8, 2006

Before: Stephen Reinhardt, Stephen S. Trott, and
M. Margaret McKeown, Circuit Judges.

Opinion by Judge Trott

**COUNSEL**

Jeffrey Wilens, Lakeshore Law Center, Yorba Linda, California, for the plaintiffs-appellants.

Michael E. Williams, Quinn Emanuel Urquhart Oliver & Hedges, LLP, Los Angeles, California, for the defendants-appellees.

**OPINION**

TROTT, Circuit Judge:

This case requires us to determine whether sections of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2702 and 2707, provide for a private cause of action against those who aid and abet, or conspire with, electronic communications service providers in unlawfully disseminating the contents of electronic communications. The language of §§ 2702 and 2707 identifies unambiguously who is subject to liability. Furthermore, the legislative history and case law is in accord with these sections' clear directive. Accordingly, we decline to read into the text of these code sections claims

for secondary liability. Rather, we interpret the code to mean what it plainly says.

## I

DirecTV is a provider of satellite digital television. To protect its service and prevent the unauthorized viewing of its television programing, DirecTV encrypts its satellite transmissions. DirecTV actively pursues legal action against those individuals involved in the unauthorized use, or in more common parlance, the pirating, of its encrypted transmissions.

On June 24, 2003, DirecTV filed a lawsuit in Canada against Daryl Gray. Gray operated a number of web sites from his home in British Columbia, Canada. The web sites allegedly offered information relating to the pirating of the DirecTV signal. DirecTV's complaint asserted that the web sites provided information regarding all forms of "piracy technology" such as the use of equipment, software, and programming codes, as well as "smart cards" specifically used to access the DirecTV signal without paying for it. DirecTV alleged also that one of the web sites—the "Pirate's Den"—run by Gray's server located in his British Columbia home provided an online meeting place for participants to discuss, exchange, and post piracy technology information.

Concerned with pirating activity, DirecTV applied to the Supreme Court of British Columbia for an injunction and order entitling DirecTV to seize Gray's computers and the data contained therein. On June 24, 2003, the court granted DirecTV's request, issuing what is referred to in Canada as an *Anton Piller* Order. An *Anton Piller* Order operates as both an injunction and a civil writ of seizure. Per this order, Gray was enjoined from operating two web sites: www.dsschat.com and www.piratesden.com. DirecTV was also able to enjoin Gray from a number of other activities relating to the accessing or facilitating of piracy technology or information.

In addition, the order granted DirecTV the right to enter Gray's offices to "search for, examine, and remove or copy" evidence of piracy-related activities including "the web sites, databases contained therein, electronic storage media and computer equipment." The order entitled DirecTV to remove or copy "any document, record, article, notes, information, instructions, correspondence, sent and received, electronic mail, howsoever stored, fixed, expressed or embodied . . . ." The order also allowed DirecTV to designate an entity to be responsible for accessing, recording, and processing the data. DirecTV designated ICG, the other defendant-appellee, as that entity.

The order provided that evidence seized from Gray was to be held in the "custody of [DirecTV's] solicitors pending the trial of this action, or until such time this Court orders otherwise." The order also provided for the appointment of an independent solicitor to carry out the terms of the seizure and to take custody of the evidence. However, the independent solicitor and DirecTV agreed independently that when the order was executed, the evidence seized would be taken into custody by the independent solicitor, not by DirecTV's lawyers. Finally, the order allowed for "any and all evidence seized or delivered up pursuant to the order [to] be used in subsequent civil proceedings commenced by DirecTV against any third party, including, but not limited to proceedings against [Gray's] customers, suppliers, members, and subscribers."

On June 26, 2003, the *Anton Piller* Order was executed at Gray's residence in British Columbia, Canada. Gray's computer servers and hard drives containing electronic communications of individuals that had accessed Gray's web sites were seized and placed in the independent solicitor's custody.

Ultimately, the lawsuit between DirecTV and Gray was resolved. In a separate agreement between Gray and DirecTV, the evidence held by the independent solicitor was released to

DirecTV. Earlier in 2003, DirecTV filed a lawsuit in the United States against Lawrence Freeman, for engaging in the distribution of illegal signal theft devices. During the litigation against Freeman, in response to initial discovery requests, DirecTV produced portions of the information gathered at Gray's residence. This information included the content of communications posted on electronic message boards accessed through Gray's web sites. On March 16, 2004, DirecTV and Freeman settled the lawsuit and entered into a settlement agreement and release.

On April 5, 2004, appellants, Freeman and Michael Scherer, filed the underlying class action. In an amended complaint, Scherer claimed that he, like Freeman, was a participant on the message boards and web sites run by Gray. Freeman and Scherer asserted that the sharing of data from Gray to DirecTV was not authorized by the *Anton Piller* Order because DirecTV had agreed that the evidence would be in custody of the independent solicitor instead of DirecTV's solicitors and that it was only released pursuant to the agreement between Gray and DirecTV. Freeman and Scherer claimed further that because there was a subsequent agreement between Gray and DirecTV that allowed DirecTV to receive the data from the independent solicitor, DirecTV conspired with and aided and abetted Gray in the disclosure of the stored communications in violation of 18 U.S.C. § 2702.

On June 7, 2004, DirecTV and ICG moved to dismiss the action for failure to state a claim and in the alternative for summary judgment. DirecTV and ICG argued that Freeman and Scherer's claims should be dismissed for three reasons: 1) 18 U.S.C. § 2702 does not provide for secondary liability claims of conspiracy or aiding and abetting; 2) Freeman and Scherer's secondary claims were not properly pled; and 3) the claims were barred under the *Noerr-Pennington* doctrine.

On July 13, 2004, the district court granted the motion to dismiss and ruled that the motion for summary judgment was,

therefore, moot. The district court granted the motion on the basis of DirecTV and ICG's first argument—that 18 U.S.C. § 2702 does not provide a basis for asserting conspiracy and aiding and abetting claims. Freeman and Scherer timely appealed that determination.

## II

A dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) is reviewed de novo. *See Decker v. Advantage Fund, Ltd.*, 362 F.3d 593, 595-96 (9th Cir. 2004). Thus, we review the matter anew, the same as if it had not been heard before, and as if no decision previously had been rendered. *Ness v. Commissioner*, 954 F.2d 1495, 1497 (9th Cir. 2002).

## III

Appellants, Freeman and Scherer, contend that the district court erred in its determination that §§ 2702 and 2707 of the ECPA do not create a cause of action for two secondary liability claims—aiding and abetting, or conspiring with an electronic communication service to disclose information. Appellees, DirecTV and ICG, assert that the district court did not err, and even if the court did err there are additional independent grounds upon which we can affirm the dismissal. DirecTV and ICG argue also that if dismissal is inappropriate, we should grant its summary judgment motion that was also before the district court. DirecTV and ICG's alternative arguments are not necessary. The district court was correct: §§ 2702 and 2707 should not be interpreted to include secondary liability claims. Thus, dismissal was proper and there is no reason for us to address DirecTV and ICG's alternative arguments.

## A

**[1]** The language of 18 U.S.C. §§ 2702(a)(1) and 2707(a) is straightforward. Section 2702(a)(1) prohibits a "person or

entity providing an electronic communication service to the public" from "knowingly divulg[ing] to any person or entity the contents of a communication while in electronic storage by that service." Section 2707(a) imposes civil liability for violating that prohibition:

> [A]ny provider of electronic communication service, subscriber, or other person aggrieved by any violation of this chapter in which the conduct constituting the violation is engaged in with a knowing or intentional state of mind may, in a civil action recover from the person or entity, other than the United States, which engaged in that violation such relief as may be appropriate.

Here, because it is uncontroverted that neither DirecTV nor ICG was a provider of the electronic communications service that stored the communications that are the basis of Freeman and Scherer's claims, the question is simply whether this statutory language creates a private right of action for conspiracy or aiding and abetting—a question of first impression.

"The starting point for [the] interpretation of a statute is always its language." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 739 (1989). "If the plain language of a statute renders its meaning reasonably clear, [we] will not investigate further unless its application leads to unreasonable or impracticable results." *United States v. Fei Ye*, 436 F.3d 1117, 1120 (9th Cir. 2006) (internal quotation marks and citation omitted).

**[2]** The text of §§ 2702(a)(1) and 2707(a) does not use the terms "conspiracy" or "aiding and abetting." Nevertheless, Freeman and Scherer argue that Congress intended to create a cause of action for secondary liability when it included in § 2707 the term "engaged." In essence, Freeman and Scherer contend that a person or entity who aids and abets or who

enters into a conspiracy is someone or something that is "engaged" in a violation.

**[3]** We decline to give the term "engaged" the broad construction urged by Freeman and Scherer. Freeman and Scherer cite no authority, nor could we find any, that support such an interpretation. Moreover, such broad construction is contrary to the context in which the term is used. Section 2707 states that a person "aggrieved by any violation of this chapter in which the conduct constituting the violation is engaged in with a knowing or intentional state of mind may" pursue a civil cause of action to recover from the person or entity "engaged in that violation such relief as may be appropriate." The term "engaged" is used twice; both times the term is used in conjunction with "violation." Section 2707 does not define the violation—it provides, under certain circumstances, the remedy for a person aggrieved by a violation that is defined in other sections, such as § 2702. Because there is no language in § 2702 suggesting secondary liability, we find no textual support for Freeman and Scherer's contention that Congress explicitly provided for aiding and abetting or conspiracy claims. We turn, therefore, to Freeman and Scherer's other arguments.

**B**

Even if the plain language does not provide for secondary liability, Freeman and Scherer contend that it is proper for us to read implicitly secondary liability into §§ 2702 and 2707. Freeman and Scherer argue that we should allow for secondary liability because it is consistent with the statute's structure and subject matter.

Freeman and Scherer's argument that secondary liability should be read into §§ 2702 and 2707 fails for four reasons. First, the language of these statutory sections is unambiguous regarding the question of who may be subject to liability, and thus there is nothing to "read into." Second, there is nothing

unreasonable about limiting liability to persons or entities providing an electronic communication service to the public. Third, the legislative reports further confirm that Congress did not intend to create secondary liability specifically with regard to this subject matter. Fourth, in cases where courts have implicitly read into a statute secondary liability claims, the statutes being interpreted in those cases have been substantially broader than either §§ 2702 or 2707 and were accompanied by legislative history suggesting approval of such claims.

As set forth above, §§ 2702 and 2707 work in tandem to impose civil liability on a defined group for specific conduct. Section 2702 identifies a particular group—"a person or entity providing an electronic communication service to the public." Section 2702 then proscribes this defined group from taking certain action—"knowingly divulg[ing] to any person or entity the contents of a communication" being stored. Section 2707 allows for persons aggrieved by a violation of § 2702 to file a civil action provided the violation is "engaged in" with a "knowing or intentional state of mind."

**[4]** There can be no question upon whom Congress intended to impose liability—it is spelled out in plain and unambiguous language. When "a statute is precise about who . . . can be liable" courts should not implicitly read secondary liability into the statute. *Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003); *see also Fei Ye*, 436 F.3d at 1120 (providing that there is no reason for further investigation of clear and unambiguous statutory language "unless its application leads to unreasonable or impracticable results."). In addition to being unambiguous, the application of §§ 2702 and 2707's plain language is not unreasonable or impractical. While Freeman and Scherer may argue over the policy justifications involved, they have not identified anything unreasonable or impracticable about limiting liability to that defined class. Indeed, it is logical to impose liability on electronic communi-

cations providers that disclose the content of the communications that they are storing.

**[5]** There is also nothing unreasonable about limiting liability to the class of individuals or entities named by Congress in a statute. As the Supreme Court explained in *Central Bank of Denver N.A. v. First Interstate Bank of Denver, N.A.*, if Congress intended to impose secondary liability by targeting aiding and abetting action, it certainly knows how to do it. 511 U.S. 164, 177 (1994) ("If, as respondents seem to say, Congress intended to impose aiding and abetting liability, we presume it would have used the words 'aid' and 'abet' in the statutory text.").[1] As pointed out by the Supreme Court, Congress has done just that on at least two occasions. *See* , *e.g.*, 18 U.S.C. § 2 (imposing the general criminal aiding and abetting statute); 7 U.S.C. § 192(g) 1988 ed. and Supp. IV (civil aiding and abetting provision found in the Packers and Stockyards Act). There is no explicit provision in §§ 2702 and 2707 or anywhere else in the ECPA, providing for secondary liability. Accordingly, it is reasonable to conclude that Congress knew what it was doing by not including such claims.

**[6]** In short, we find no support for the argument that secondary liability should be imposed. Thus, where as here, the statutory sections are clear about upon whom they are imposing liability and there are no unreasonable or impracticable results, we consider ourselves precluded from substituting our judgment of what would be a good law for that of Congress's expressed will. Our statutory analysis is, therefore, complete, and we have no need to investigate further. *Fei Ye*, 436 F.3d

---

[1]In *Central Bank*, the Supreme Court examined § 10(b) of the Securities Exchange Act of 1934 and concluded that the statute did not reach secondary actors, such as those who aid and abet violations of the securities laws. 511 U.S. at 177. Freeman argues that this holding is limited to the securities law context. However, it is the Supreme Court's approach to interpreting the statute, not the actual statute itself, that is significant. Thus, the fact that the court was interpreting a different act of Congress—the Securities Exchange Act—is inconsequential.

at 1120; *see also Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("When the words of a statute are unambiguous, then, this first canon is also the last: the judicial inquiry is complete.").

**C**

**[7]** Even if we were to accept Freeman and Scherer's invitation to consider the policy goals and legislative history, there is nothing about those goals or history that contradicts our determination that Congress intended to limit liability to providers of electronic communication services. Freeman and Scherer's argument that the ECPA aims to protect the privacy of electronic communications is true, but inconsequential. Such broad goals tell us nothing about how Congress decides to accomplish a particular task.

**[8]** Furthermore, the legislative history, like the language of the statute, is clear. The Senate Report describing the application of § 2702 states,

> The application of section 2702(a) generally prohibits *the provider* of a wire or electronic communication service to the public from knowingly divulging the contents of any communication while in electronic storage by that service to any person other than the addressee or intended recipient.

S. Rep. 99-541, 1986 U.S.C.C.A.N. 3555, 3591 (emphasis added). Like the language of the statute sections, there is nothing ambiguous about this directive, which only identifies providers of electronic communication services that are storing electronic communications. Other provisions in the report also indicate the same restrictiveness. The very next paragraph in the record, describing the application of the immediately preceding section, states that liability is "limited to providers of wire or electronic communications services." S. Rep. 99-541, 1986 U.S.C.C.A.N. 3555, 3591.

Perhaps most telling is that nothing in the legislative history of § 2702 even hints at allowing claims for aiding and abetting or conspiracy. Thus, because we do not apply a " 'dog that didn't bark' theory of statutory construction to reach a contradictory interpretation of unambiguous text," we conclude that Freeman and Scherer's legislative and textual arguments are without merit. *See Patenaude v. Equitable Life Assurance Soc'y of United States*, 290 F.3d 1020, 1025 (9th Cir. 2002); *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 68 (1982) ("[A]bsent a clearly expressed legislative intention to the contrary, [the statute's] language must ordinarily be regarded as conclusive.") (internal quotations marks and alterations omitted).

## D

**[9]** Freeman and Scherer are right to point out that there is no blanket prohibition on secondary liability where Congress does not use the magical words, "aid and abet." However, the cases they rely on do not support their claim that such liability is part of the ECPA in this case. This lack of support is best illustrated by Freeman and Scherer's reliance on *Boim v. Quranic Literacy Inst. and Holy Land Found. for Relief and Dev.*, 291 F.3d 1000 (7th Cir. 2002). In *Boim*, the Seventh Circuit recognized an implicit aiding and abetting cause of action in an international terrorism statute. *Id.* at 1011. The plaintiffs, parents of a United States student killed by Hamas, attempted to bring a secondary liability claim against the defendants, a group it asserted was laundering money for Hamas. *Id.* at 1002. The district court denied the defendant's motion to dismiss the claim because it found the anti-terrorism statute that was the basis for the action provided implicitly for aiding and abetting liability. *Id.* at 1007. The Seventh Circuit upheld the district court determination. *Id.* at 1021. Relying on *Boim*, Freeman and Scherer argue that §§ 2702 and 2707, like the anti-terrorism statute, is sufficiently broad to include secondary liability. This argument is not persuasive.

**[10]** First, unlike the present circumstance, the anti-terrorism statute in *Boim* did not clearly impose liability on a limited "class of defendants." *Id.* at 1010. Rather, it created liability for all individuals committing "international terrorism" and broadly defined terrorism as any activity that "involve[s] violent acts or acts dangerous to human life." *Id.* at 1009-10. The Seventh Circuit latched on to the word "involve," finding that "involvement" includes "many levels of participation" and was therefore ambiguous. *Id.* at 1009. Faced with an ambiguous term, the Seventh Circuit looked to legislative history and specific testimony in the record where Congress stated that it intended to impose liability "at any point along the causal chain of terrorism." *Id.* at 1011 (citing S. Rep. 102-342, at 22 (1992)). Moreover, the legislative history indicated that a specific goal of the statute was to "interrupt, or at least imperil, the flow of money" to terrorist organizations—the act that was the basis for the claim. *Id.* at 1011. Here, the ECPA provides a private cause of action against individuals or entities who "engaged in" a violation of its terms. 18 U.S.C. § 2707. However, unlike the broad language of the terrorism statute in *Boim*, which reached anyone "involved" in any act of international terrorism, the plain language of § 2702 reaches a more specified and limited class—providers of electronic communications services. Moreover, because the term "involved" was ambiguous, the court in *Boim* looked to legislative history, which provided specific support for secondary liability. Here, there is no ambiguity and no legislative history indicating that Congress had such expansive intentions. Rather, the language and the legislative history of the ECPA are clear and unambiguous; neither reaches beyond the limited class of defendants identified in the statute. Thus, we conclude that *Boim* is inapposite and, therefore, not a basis for reading secondary liability into §§ 2702 and 2707.

**[11]** Freeman and Scherer's reliance on *Quigley v. Rosenthal*, 327 F.3d 1044 (10th Cir. 2003), is similarly unpersuasive. In *Quigley*, the trial court allowed jury instructions on

both agency and conspiracy under a different portion of the ECPA (18 U.S.C. § 2511) that, like §§ 2702 and 2707, does not explicitly provide for secondary liability. *Id.* at 1062-64. However, because the jury was given a general verdict form that did not require the jury to identify which legal theory—agency or conspiracy—was the basis for its finding that the ECPA was violated, it was impossible for the Tenth Circuit to tell "whether the alleged improper instructions on conspiracy warranted a reversal of the jury's [ECPA] verdict." *Id.* at 1064. The Tenth Circuit resolved the conspiracy issue by turning to the standard of review—plain error, because no objection was made at trial. *Id.* at 1063-64. The Tenth Circuit concluded:

> After review, we conclude that the [appellant] has failed to satisfy this extremely high burden [plain error]. The [appellant] cannot credibly refute the plaintiffs' assertions that it acquiesced in the plaintiffs' conspiracy theory and the district court's conspiracy instruction. Further, the [appellant] has failed to cite any case that holds that a person or entity cannot violate the federal wiretap act by joining with others in a conspiracy.

*Id.* Although one might argue that the Tenth Circuit would allow for a conspiracy claim to be read into the § 2511 of the ECPA, the Tenth Circuit does not definitively say it would or provide any meaningful rationale, other than lack of case law, for why it might allow for such a claim.

**[12]** Regardless of whether the Tenth Circuit had made such a conclusion, it would mean very little to § 2702—a completely different section of the ECPA. Furthermore, the portion of the ECPA at issue in *Quigley*—§ 2511—is not as textually limiting as §§ 2702 and 2707. Section 2511 imposes liability on "any person" and then lists a number of prohibited actions. Section 2702 by contrast identifies a particular group —electronic service providers—and then specifies the limited

circumstance that, as a result of § 2707, will subject that particular group to liability.

Thus, while mildly supportive of Freeman and Scherer's general proposition, *Quigley* is far from being persuasive. Moreover, this indirect support is heavily outweighed by the explicit language of §§ 2702 and 2707 and the accompanying legislative report language, as well as case law that declines to implicitly read into a statute secondary liability when the statute does not so provide.

## IV

**[13]** We hold, therefore, that the unambiguous language of 18 U.S.C. §§ 2702 and 2707 limits liability to providers of electronic communication services that knowingly divulge the contents of those communications while being stored by that provider. We reject Freeman and Scherer's to read implicitly into these statutory provisions claims for conspiracy or aiding and abetting. In addition to being contrary to the plain language of §§ 2702 and 2707, such an implied interpretation is not supported by legislative history or case law. Accordingly, we affirm the district court's order dismissing Freeman and Scherer's complaint.

**AFFIRMED.**