**AVISTA CORPORATION, INC., Plaintiff,**

v.

**SANDERS COUNTY, Burlington Northern and Santa Fe Railway Company, Dorrien H. Wolfe, Diane Larson, Leslie Rickey, Sean M. Stephens, James R. Doyle, Bonnie M. Sharp, Ronald Gene Sharp, Ronald Scott Sharp, and Gregory Stewart Sharp, Defendants.**

**No. CV 05 201 M JCL.**

United States District Court, D. Montana, Missoula Division.

March 19, 2007.

Christian T. Nygren, Milodragovich Dale Steinbrenner & Binney, Missoula, MT, for Plaintiff.

Robert L. Zimmerman, Office of Sanders County Attorney, Thompson Falls, MT, Gregory G. Schultz, Law Offices of Gregory Schultz, P.C., Missoula, MT, for Defendants.

ORDER

LYNCH, United States Magistrate Judge.

At issue in this litigation is ownership of a former railroad right of way established under the Northern Pacific Land Grant Act of 1864. The parties have filed cross-motions for summary judgment, which are fully briefed. Following a hearing, and the Court's review of the briefs and other materials of record,

IT IS ORDERED that the individual Defendants' motion for summary judgment is GRANTED, and the Plaintiff's motion for summary judgment is DENIED.

### RATIONALE

### I. Background

The parties do not dispute the following material facts. In 1864, Congress passed the Northern Pacific Railroad Company Land Grant Act, 13 Stat. 365 ("1864 Act"), which established the Northern Pacific Railroad for purposes of building and maintaining a railroad from Lake Superior to Puget Sound. Section 2 of the 1864 Act granted the railroad a 400–foot wide right of way, extending "200 feet in width on each side of said railroad where it may pass through the public domain."

By the early 1880s, the Northern Pacific Railroad had constructed its rail line on the south bank of the Clark Fork River, over what would later be surveyed as Government Lot 5 of Section 24 in Township 26 North, Range 33 West. In 1921, Arthur Hampton acquired the patent to Government Lot 5 under the Homestead Act of 1862, 12 Stat. 392.[1] Defs.' Br. in Support (Nov. 16, 2006), Ex. 1. The patent purported to convey all of Government Lot 5, and contained no mention of Northern Pacific's pre-existing right of way.

In the early 1950s, Avista Corporation Inc.'s predecessor, Washington Water Power (WWP), began construction of the Cabinet Gorge Dam in Idaho, thereby creating the Cabinet Gorge Reservoir on the Clark Fork River. To fill the reservoir, WWP needed to secure either fee title to the shoreline or water flowage easements over shoreline property. Accordingly, in July 1952, Arthur Hampton's widow, Fan-

---

1. The patent also included a contiguous area to the south described as the southwest quar- ter of the northwest quarter of Section 24.

ny Hampton, deeded "[a]ll that part of Government Lot 5...lying north of the Northern Pacific right of way" to Avista Corporation Inc.'s predecessor, Washington Water Power (WWP). Defs.' Br. in Support, Ex. 3. The deeded area was less than one acre in size, and bordered on the north by the Clark Fork River. Defs.' Br. in Support, Ex. 3. Approximately one year later, in July 1953, Northern Pacific purported to relinquish to the United States the northernmost 100 foot wide strip of the right of way. Defs.' Br. in Support, Ex. 4 and 5. Then, in December 1956 Northern Pacific granted WWP a flowage easement "to the extent of its legal right to do so," on what appears to be the northern edge of the right of way in Government Lot 5. Defs.' Br. in Support, Ex. 8.

In the meantime, in July 1955, Northern Pacific agreed with WWP to abandon its right of way on the south side of the Clark Fork River and relocate its rail line to the north side of the river. Defs.' Br. in Support, Ex. 6. This would facilitate WWP's efforts to construct and maintain a hydroelectric power dam and reservoir, known as the Noxon Rapids Hydro-electric Development, on the Clark Fork River. Defs.' Br. in Support, Ex. 6. By late 1957, Northern Pacific's rail line had been relocated to the north side of the Clark Fork River and the railroad had released its track and other personal property on the south side of the river to WWP. Defs.' Br. in Support, Exs. 10, 11, 12.

Several months later, counsel for WWP expressed concern that title to the right of way might revert to the United States or vest in another third party, presumably under 43 U.S.C. § 912, a federal statute designed to address the disposition of abandoned railroad rights of way. Defs.' Br. in Support, Ex. 13, 14. To avoid such a result, WWP asked Northern Pacific to convey title to the right of way to Sanders County. Defs.' Br. in Support, Ex. 14. Northern Pacific acquiesced and executed a quitclaim deed on October 1, 1958, conveying its interest in several portions of the right of way, including that portion traversing Government Lot 5, to Sanders County. Defs.' Br. in Support, Ex. 15. Also on October 1, 1958, Northern Pacific executed a bill of sale for the tracks and structures on the right of way.[2] Defs.' Br. in Support, Ex. 15 p. 4. Sanders County accepted the quitclaim deed on February 8, 1961, and public use of a road over the former railroad right of way began in the early 1970s. Defs.' Br. in Support, Exs. 18, 20.

Sanders County has since questioned the efficacy of that transfer, and has for some time taken the position that it holds only road easements on the former railroad right of way rather than fee title. In 2004, in an attempt to clarify the state of title to the former right of way, Sanders County quitclaimed to Arthur and Fanny Hampton's descendants any and all of its interest in Government Lot 5 and the southwest quarter of the northwest quarter of Section 24. Defs.' Br. in Support, Ex. 21. In doing so, the County reserved two 60–foot public rights of way. Defs.' Br. in Support, Ex. 21.

The descendants to whom Sanders County quitclaimed its interest are the individual Defendants in this litigation,[3]

---

**2.** Although the bill of sale itself is not part of the record before the Court, the Northern Pacific's October 1, 1958 quitclaim deed references a bill of sale bearing the same date. Defs.' Br. in Support, Ex. 15 p. 4.

**3.** The individual Defendants are Dorrien Wolfe, Diane Larson, Leslie Rickey, Sean Ste-

phens, James Doyle, Bonnie Sharp, Ronald Gene Sharp, Ronald Scott Sharp, and Gregory Stewart Sharp. They are all descendants, by blood or marriage, of Arthur and Fanny Hampton. Deposition James Doyle, pp. 6–9 (Feb. 16, 2007).

and are now embroiled in a dispute with Avista Corporation Inc. ("Avista") over who has title to the former railroad right of way. Avista contends that Sanders County has title pursuant to the 1958 quit-claim deed, and maintains that the County's subsequent attempt to quitclaim the property to the individual Defendants in 2004 was of no legal effect. Alternatively, Avista claims that title vests in it and the individual Defendants, as adjacent land-owners, with each taking to the center line of the former right of way. The individual Defendants disagree, and maintain that title lies solely with them under federal law, as the descendants of the original paten-tee.

Avista commenced this action against the individual Defendants and Sanders County for the purpose of resolving this title dispute.[4] Complaint (Dec. 27, 2005). Avista asserts declaratory judgment and quiet title claims, seeking a declaration by this Court "regarding the ownership of the right of way traversing Government Lot 5 . . ." and quieting title in Sanders County. Amended Complaint, ¶¶ 21–32 (Sept. 1, 2006). Avista also claims that Sanders County acted negligently by disclaiming its interest in the right of way to the individual Defendants without first giving notice and public hearing.[5] Amended Complaint, ¶¶ 33–38.

This case is ripe for determination on the parties' pending cross-motions for summary judgment.[6]

## II. Summary Judgment Standards

A party moving for summary judgment bears the burden of demonstrating "that there is no genuine issue as to any materi-al fact and that the moving party is enti-tled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A movant may satisfy that burden where the documentary evi-dence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demon-strate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the moving party has met its initial burden with a properly sup-ported motion, the party opposing the mo-tion "may not rest upon the mere allega-tions or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* at 248, 106 S.Ct. 2505

Here, the parties have expressly ac-knowledged that their motions are proper-ly resolved upon the present record, as there does not exist any other evidence to present to the Court.

---

4. Avista also named Burlington Northern and Santa Fe Railway Company as a defendant. Complaint (Dec. 27, 2005). Burlington Northern subsequently moved to dismiss the Complaint pursuant to Fed.R.Civ.P. 12(b)(6). On August 7, 2006, this Court granted the motion, dismissing Avista's Complaint against Burlington Northern without prejudice.

5. Avista's Amended Complaint also contains claims for adverse possession and a prescrip-tive easement. Amended Complaint, ¶¶ 39–45. Avista has since conceded, however,

"that its claim of adverse possession is unsup-ported by the evidence of record." Response to Defs.' Mot., 1–2 (Dec. 22, 2006). In addi-tion, Avista has effectively conceded that its claim for prescriptive easement is without merit.

6. Sanders County continues to deny any inter-est in the disputed right of way, and has joined in the individual Defendants' motion for summary judgment. Notice of Joinder (Jan. 4, 2007).

## III. Discussion

■ The individual Defendants argue they have title to that portion of Northern Pacific's former right of way that traverses Government Lot 5 pursuant to Abandoned Railroad Right of Way Act, 43 U.S.C. § 912. Avista, in contrast, maintains that Sanders County holds title to the former right of way under Section 912, and the County's attempt to quitclaim the property to the individual Defendants was of no legal effect.[7] Alternatively, Avista asserts it has title to the centerline of the abandoned right of way by virtue of its alleged status as an adjacent landowner.

### A. Application of Section 912

The parties agree that resolution of their dispute over title to Northern Pacific's former right of way turns first and foremost on proper interpretation and application of the Abandoned Railway Right of Way Act, 43 U.S.C. § 912. As always, "[t]he starting point for [the] interpretation of a statute is" the language of the statute itself. *Freeman v. DirecTV, Inc.,* 457 F.3d 1001, 1004 (9th Cir.2006) (*quoting Cmty. for Creative Non–Violence v. Reid,* 490 U.S. 730, 739, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989)). "If the plain language of the statute renders its meaning reasonably clear, [the Court] will not investigate further unless its application leads to unreasonable or impracticable results." *Freeman,* 457 F.3d at 1004–05 (*quoting United States v. Fei Ye,* 436 F.3d 1117, 1120 (9th Cir.2006)).

This Court begins its analysis of the parties' respective arguments by turning briefly to the events preceding passage of Section 912. As noted above, Arthur Hampton ("Hampton") received the patent to Government Lot 5 in 1921, pursuant to the Homestead Act of 1862. The United States patent purported to give Hampton title to all of Government Lot 5, making no mention of the preexisting railroad right of way. Defs.' Br. in Support, Ex. 1. Both parties agree, however, that Hampton's patent was nevertheless subject to Northern Pacific's Act right of way under the 1864 Act.

Known as a land grant railroad statute, the 1864 Act gave Northern Pacific title in the form of a "limited fee, made on an implied condition of reverter in the event that the company ceased to use or retain the land for the purpose for which it was granted." *Northern Pacific Railway Company v. Townsend,* 190 U.S. 267, 271, 23 S.Ct. 671, 47 L.Ed. 1044 (1903). Under the *Townsend* court's interpretation, such a land grant railroad right of way would revert to the United States in the event the railroad stopped using the right of way for railroad purposes. *Townsend,* 190 U.S. at 271–72, 23 S.Ct. 671. Because of the United States' potential interest, a railroad did not have "the power to voluntarily alienate [such a] right of way or any portion thereof," and third parties could not prevail on an adverse possession claim. *Townsend,* 190 U.S. at 271–72, 23 S.Ct. 671.

Approximately twenty years after the *Townsend* decision, Congress passed the Abandoned Railroad Right of Way Act, 43 U.S.C. § 912, "to dispose of the abandoned railroad lands to which the United States held a right of reverter under *Townsend.*" *Mauler v. Bayfield County,* 309 F.3d 997, 999 (7th Cir.2002). Section 912 effectively eliminated the United States' reversionary interest in abandoned railroad rights of way, providing in pertinent part as follow:

---

**7.** The individual Defendants challenge Avista's standing to quiet title in a third party. Because the individual Defendants are entitled to summary judgment on the merits for the reasons set forth below, this Court will assume for purposes of this discussion that Avista has standing.

Whenever public lands of the United States have been or may be granted to any railroad company for use as a right of way for its railroad or as sites for railroad structures of any kind, and use and occupancy of said lands for such purposes has ceased or shall hereafter cease, whether by forfeiture or by abandonment by said railroad company declared or decreed by a court of competent jurisdiction or by Act of Congress, then and thereupon all right, title, interest, and estate of the Unites States in said lands shall, except such part thereof as may be embraced in a public highway legally established within one year after the date of said decree or forfeiture or abandonment be transferred to and vested in any person, firm, or corporation, assigns, or successors in title and interest to whom or to which title of the United States may have been or may be granted, conveying or purporting to convey the whole of the legal subdivision or subdivisions traversed or occupied by such railroad or railroad structures...and this by virtue of the patent thereto and without the necessity of any other or further conveyance or assurance of any kind or nature whatsoever....

43 U.S.C. § 912.

When first called upon to interpret Section 912, the Ninth Circuit concluded that "for reversionary rights to vest under § 912, the railroad must 1) cease 'use and occupancy' of the rights of way *and* 2) abandonment must be 'declared or decreed' by a court of competent jurisdiction or a congressional act." *Vieux v. East Bay Regional Park District,* 906 F.2d 1330, 1337 (9th Cir.1990) (expressly adopting the test formulated by United States District Court for the District of Idaho in *State of Idaho v. Oregon Short Line Railroad Company (Idaho II),* 617 F.Supp. 213, 218 (D.Idaho 1985)). When both of those events have occurred, then "[a]ll

right/title/interest of the United States in such lands shall be transferred to and vested in any person or [successors in title and interest to any person] to whom the United States has granted title by a conveyance purporting to convey lands traversed by [the] railroad." *Idaho II,* 617 F.Supp. at 216.

As the Ninth Circuit recognized, however, "[t]hose vested reversionary rights are subject to divestment under the Section 912 'exceptions' clause which provides that [declared or decreed] abandoned rights of way vest in the reversionary landowners 'except such part thereof as may be embraced in a public highway legally established within one year after the date of said decree *or* forfeiture *or* abandonment.....'" *Vieux,* 906 F.2d at 1337.

Using the test set forth in *Idaho II* and adopted by the Ninth Circuit in *Vieux* as a roadmap, this Court must first determine when Northern Pacific actually abandoned the right of way by ceasing its use and occupancy.

1. *Abandonment—Use and Occupancy*

■■ The question of when a railroad has ceased using and occupying a right of way for railroad purposes involves a factual inquiry. *Vieux,* 906 F.2d at 1340. Guiding this inquiry are the "plain and apparent meaning of the [statutory] terms," as well as "common law principles of abandonment." *Vieux,* 906 F.2d at 1340. Common law principles of abandonment include a "present intent to abandon," and "physical acts evidencing clear intent to relinquish the property interest." *Vieux,* 906 F.2d at 1341 (*citing Idaho II,* 617 F.Supp. at 217). Many "[o]ther circuits have characterized 'abandonment' to be 'an intention of the carrier to cease permanently or indefinitely' all transportation service on the relevant line." *Vieux,* 906 F.2d at 1340 (*quoting Chicago & N.W.*

*Transp. Co.*, 450 U.S. at 314, n. 2, 101 S.Ct. 1124). Among the indicia relevant to the "use and occupancy" inquiry are whether the railroad has removed its tracks and other railroad structures, whether it uses the right of way for storage or other railroad purposes such as training exercises, and whether it continues to pay property taxes on the right of way as "operating property". *Idaho II*, 617 F.Supp. at 217; *Vieux*, 906 F.2d at 1340–41.

Here, the individual Defendants argue the undisputed evidence of record establishes that Northern Pacific actually abandoned its right of way in Government Lot 5 no later than October 1958. For support, they point first to a written agreement entered into by Northern Pacific and WWP in July 1955 in which the railroad agreed to abandon its right of way long a stretch of land on the south side of the river upon relocation of its rail line to the north side of the river. Defs.' Br. in Support, Ex. 6. The agreement provided, among other things, that WWP was to "[r]emove the abandoned line of railroad," and could salvage the track that it replaced. Defs. Br. in Support, Ex. 6, p. 14, 20. Northern Pacific specifically agreed that, upon receiving title to the relocated railroad property from WWP, it would "transfer, insofar as it may legally do so, all its rights and title in the present railroad property to be abandoned to [WWP]." Defs.' Br. in Support, Ex. 6, p. 21.

In April 1957, Northern Pacific confirmed in correspondence to WWP that it "understood from the terms of the contract that all of [its] main line on the south side of the river...between the two new rivers crossings was to be abandoned and all service eliminated." Defs.' Br. in Support, Ex. 9. Such evidence indeed illustrates that Northern Pacific intended to abandon those portions of its right of way on the south side of the river, including that portion traversing Government Lot 5, when the relocated rail line was up and running.

Additional evidence of record establishes that Northern Pacific followed through on its intent, and had actually abandoned the right of way as planned by the Fall of 1958. In August 1957, for example, the Montana Board of Railroad Commissioners ordered that the Northern Pacific's stations on the south side of the river at Tuscor and Noxon be closed and abandoned. Defs.' Combined Reply, Ex. 28. Relocation of the rail line was complete in October 1957, and Northern Pacific released the track and other personal property on the south side of the river to WWP. Defs.' Br. in Support, Exs. 10, 11, 12. In January 1958 Northern Pacific stated that it would "discontinue handling of traffic" on the right of way, and WWP subsequently agreed that, beginning on September 30, 1958, it would handle all traffic on the right of way. Defs.' Combined Reply, Exs. 29, 30. In September 1958, WWP expressed concern that title to the right of way might revert to the United States or otherwise vest in a third party, presumably pursuant to Section 912. Defs.' Br. in Support, Ex. 13. To avoid such a result, WWP asked Northern Pacific to convey title to the right of way to Sanders County for road purposes. Defs.' Br. in Support, Ex. 14. Northern Pacific complied, and on October 1, 1958 executed a quitclaim deed conveying to Sanders County its interest in several portions of the right of way, including that portion traversing Government Lot 5. Defs.' Br. in Support, Ex. 15.

It is clear from the foregoing undisputed evidence of record that Northern Pacific had ceased its use and occupancy of the railroad right of way on the south side of the river by the Fall of 1958. Northern Pacific had discontinued its railway service on the right of way by that time, had

abandoned its stations on the right of way, had released the track for WWP's disposal, and had executed a bill of sale for the track and other structures on the right of way. Northern Pacific did not use the right of way for any railroad purpose after October 1958, and had repeatedly indicated in writing that it intended to permanently relinquish its interest in the right of way, going so far as to quitclaim the property to Sanders County.

Avista argues that the above-cited evidence is insufficient to establish that Northern Pacific had ceased its use and occupancy of the right of way by October 1958. It notes, for example, that there is no evidence as to whether Northern Pacific continued to pay property taxes on the right of way after October 1958, and no record establishing when the tracks and other structures were actually removed from the right of way. In the absence of any such evidence, Avista argues the individual Defendants have failed to establish that actual abandonment occurred by October 1958 under the criteria set forth in *Idaho II*. Although the *Idaho II* court found such evidence relevant to its "use and occupancy" analysis, it did not presume to set forth an exhaustive test for establishing actual abandonment. The question of when actual abandonment occurred involves a factual inquiry, which by its nature turns on the evidence of record in any given case and the absence of tax records or documentation of track removal in this case is not dispositive.

Recognizing the factual nature of the inquiry at hand, Avista argues Northern Pacific did not cease its use and occupancy until at least 1960. For support, Avista points to a letter indicating that Northern Pacific had performed a track inspection at WWP's request in April 1960. Avista's Response, Ex. 3. While this letter indicates Northern Pacific acceded to a request by WWP that it inspect portions of its former right of way, the document says nothing about use and occupancy of the right of way and there is no indication that Northern Pacific inspected the rail line for its own purposes.[8]

Citing *Vieux*, Avista next maintains the fact that Northern Pacific quitclaimed its interest in the right of way to Sanders County in October 1958 is inconsistent with actual abandonment. The Ninth Circuit indeed commented in *Vieux* that "the fact that the railroad quitclaimed the rights of way to the County and took the fiber optics and pipeline easements back from the county all show an intent not to abandon." *Vieux*, 906 F.2d at 1341. While the *Vieux* court thus found the railroad's quitclaim deed was inconsistent with an intent to abandon, it did so under very different circumstances. The railroad in *Vieux* conveyed the right of way before ceasing its own use and occupancy, and continued to use and occupy the right of way by way of the fiberoptic and pipeline easements it retained. *Vieux*, 906 F.2d at 1341. Here, in contrast, Northern Pacific retained no such use and occupancy of the right of way, and the quitclaim deed it

---

8. Avista also points to an internal WWP memorandum from February 1959 mentioning a revision to the October 1, 1958, bill of sale for the track on the south side of the river, and a May 1959 letter in which WWP stated it had received the bill of sale for the main line track and other structures on the right of way. Avista's Response, Exs. 1 & 2. Even assuming, without deciding, that these documents constitute evidence that Northern Pacific did not abandon its right of way until the Spring of 1959, that would have no effect on the outcome here. As discussed below, it is undisputed that the County did not accept Northern Pacific's quitclaim until February 1961. Even taking February or May of 1959 as the date of actual abandonment, this would put the County's acceptance outside the one year statutory window set forth in Section 912.

executed is perfectly consistent with its clear and consistently expressed intent to permanently abandon the right of way. *See e.g. Washington Securities and Investment Corp. v. Horse Heaven Heights*, 132 Wash.App. 188, 130 P.3d 880, 887 (2006) (recognizing that "an outright transfer of title may indicate a permanent intention by the railroad to cease use of that portion of the right-of-way").

Finally, Avista maintains that Northern Pacific's failure to follow abandonment procedures outlined by the Interstate Commerce Commission (ICC) shows that it did not intend to abandon the right of way in 1958. According to the Ninth Circuit, however, ICC approval is not a prerequisite to abandonment under Section 912. *Vieux*, 906 F.2d at 1339. As the *Vieux* court noted, while "the ICC regulates and approves abandonment," it "does not determine abandonment." *Vieux*, 906 F.2d at 1339. While failure to follow ICC procedures may, as Avista argues, be one factor for the Court to consider in evaluating the railroad's intent to abandon, it is unlikely that Northern Pacific's decision to abandon its right of way in this case would even have fallen within the ICC's regulatory scheme. As the *Vieux* court recognized, an exception to ICC approval is typically available where the railroad's abandonment will not result in any cessation of service. *Vieux*, 906 F.2d at 1339. The evidence of record in this case indicates there was no cessation in Northern Pacific's service when it abandoned its right of way because, by that time, its rail line had been relocated to the north side of the river. In any event, the *Vieux* court recognized that "a railroad could abandon without any involvement from the ICC if there is no injunctive action brought and if a court decrees that a railroad has abandoned the line." *Vieux*, 906 F.2d at 1341. Clearly, neither the ICC nor the state or federal government has brought an injunctive action against Northern Pacific. And because this order constitutes a decree that Northern Pacific has abandoned its right of way, no ICC approval is, or was, necessary.

For all of the reasons set forth above, this Court finds that the overwhelming evidence of record establishes that Northern Pacific had ceased its use and occupancy of the right of way for railroad purposes by October 1958. The same undisputed facts of record establish that Northern Pacific had the present intent to abandon its right of way at that time, and evidenced that intent through its unequivocal physical acts. Having so determined, this Court turns now to the question of whether it can retroactively decree that Northern Pacific abandoned its right of way in 1958.

### 2. *Abandonment—Declaration or Decree*

■ For reversionary rights to vest in the individual Defendants as successors to the original patentee under Section 912, Northern Pacific must not only have ceased its use and occupancy of the right of way, but its abandonment must also "be 'declared or decreed' by a court of competent jurisdiction or a congressional act." *Vieux*, 906 F.2d at 1337. The parties do not dispute this Court's jurisdiction to enter a decree or declaration of abandonment.[9] Avista does, however, challenge this Court's authority to enter such a decree retroactively to 1958.

In *Vieux*, the Ninth Circuit did just what Avista maintains this Court cannot do, and upheld a declaration by the district

---

**9.** It is also undisputed that Congress has never decreed or declared the right of way abandoned.

court in 1988 that abandonment had occurred three years earlier. *Vieux,* 906 F.2d at 1341. The Ninth Circuit found that the county in that case had "legally established a public highway...within one year of" the 1985 abandonment, thereby extinguishing the landowners of their reversionary rights under Section 912. *Vieux,* 906 F.2d at 1341–42. The fact that the railroad in this case actually abandoned its right of way decades ago, instead of a few years ago, is immaterial. *Vieux* stands for the legal proposition that this Court can declare that Northern Pacific abandoned its right of way some time in the past, and turn then to the question of who takes title pursuant to Section 912's remaining terms.

The undisputed evidence of record establishes that Northern Pacific abandoned its right of way in October 1958.[10] Under Section 912, "then and thereupon all right, title, interest, and estate of the United States" in the right of way was "transferred to and vested in" the individual Defendants, as "successors in title and interest" to Hampton, the person to whom the United States had granted title in 1921 by way of a patent purporting to convey all of Government Lot 5, including the land traversed by the railroad.[11] Having so concluded, the Court must next determine whether Section 912's exceptions clause extinguishes the individual Defendants' reversionary rights.

3. *Exceptions Clause*

■■ Pursuant to Section 912, the individual Defendants' reversionary rights could be divested under the "exceptions

clause," which provides that abandoned rights of way vest in the reversionary landowners "except such part thereof as may be embraced in a public highway legally established within one year after the date of said decree or forfeiture or abandonment..." 43 U.S.C. § 912. Courts look to state law to determine what constitutes "a 'public highway legally established' for the purposes of federal land grant statutes, including Section 912." *Vieux,* 906 F.2d at 1341.

Under Section 912, Sanders County had one year from the October 1958 date of abandonment within which to establish a public highway. It is undisputed, however, that Sanders County did not establish a public highway until more than two years later, on February 8, 1961, when it formally accepted Northern Pacific's quitclaim. Defs.' Br. in Support, Ex. 18.

To avoid this problem, Avista takes the position that Section 912's one year period should run from the date of this Court's decree rather than the date of actual abandonment. As discussed above, however, there is nothing to prevent this Court from retroactively declaring the right of way abandoned as of 1958. Several courts, including the Ninth Circuit in *Vieux,* have concluded that the one year period for establishing a public highway begins to run on the date of actual abandonment rather than the date of the court's order. *Vieux,* 906 F.2d at 1341; *Marshall v. Chicago and Northwestern Transportation Company,* 31 F.3d 1028, 1030 (10th Cir. 1994) (concluding that the railroad "did not convey any portion of said right of way to

---

10. Even if this Court were to conclude otherwise and hold that the date of this Order constitutes the date of abandonment, the individual Defendants would still take title to that portion of the former right of way not embraced by the County road for the reasons set forth below.

11. On its face, the United States patent Hampton received in 1921 purported to convey to him all of Government Lot 5. The patent did not mention the preexisting railroad right of way traversing the property. The patent thus "purported to convey lands traversed by [the] railroad."

a state, county, or municipality within one year of such abandonment"); *Mauler v. Bayfield County*, 309 F.3d 997, 999 (7th Cir.2002) (explaining that "Section 912 requires that...railroad rights of way be turned into public highways within one year of their abandonment").

Accordingly, the one year period set forth in Section 912's exceptions clause began to run when Northern Pacific abandoned the right of way in October 1958, and had long since expired by the time Sanders County legally established a public highway in February 1961. Because Sanders County did not establish a public highway on the right of way within the one year period for doing so, the individual Defendants' reversionary rights were not extinguished and they took title to the abandoned right of way as successors to the original patentee of Government Lot 5.[12] The individual Defendants' interest in the right of way is subject only to WWP's flowage easement and the County's roads, which have been established by prescriptive use.

Even if the Court were to accept Avista's argument and declare the date of this Order as the date of Northern Pacific's abandonment, the individual Defendants would still hold title to that portion of the right of way traversing Government Lot 5 with the exception of the County's roads. Section 912 provides that upon abandonment of a railroad right of way, "then and thereupon all right, title, interest, and estate of the United States in said lands shall, *except such part thereof as may be embraced in a public highway* legally established within one year after the date of said decree or forfeiture or abandonment be transferred to and vested in any person" or successors in title and interest to any person to whom the United States had granted title by a conveyance purporting to convey lands traversed by the railroad. 43 U.S.C. § 912 (emphasis added); *Idaho II*, 617 F.Supp. at 216.

Clearly, if the date of this Order is taken as the date of abandonment, it would have to said be that Sanders County's pre-existing roads were legally established within the one year statutory period. By its terms, Section 912 would thus preclude the individual Defendants from taking title to only that part of the former right way "embraced in" those legally established public highways. Only a portion of the 400–foot wide right of way traversing Government Lot 5 is "embraced in" a legally established public highway. Nothing in Section 912 would give the County title to the entirety of a 400–foot wide right of way, where the legally established public highway "embraces" only 60, or some other identifiable portion, of those 400 feet. To the contrary, Section 912 would only divest the individual Defendants of "such part" of the right of way "as may be embraced in [the] public highway." Under the plain meaning of Section 912's remaining terms, title to that portion of the right of way not "embraced" by Sanders County's legally established public highways would go to the individual Defendants, as successors in interest to the original patentee Government Lot 5, which was traversed by the railroad.

In sum, this Court concludes that the undisputed evidence of record establishes that Northern Pacific abandoned its right of way in October 1958 and title to the former right of way vests in the individual Defendants pursuant to Section 912, subject only to WWP's flowage easement and Sanders County's roads. The result would be the same even if the Court were to take

---

12. Because Sanders County took nothing by way of Northern Pacific's quitclaim, this Court need not address Avista's argument that the County's subsequent quitclaim to the individual Defendants was without any legal effect.

the date of this Order as the abandonment date.

## B. Centerline Theory

■ Assuming, as this Court has decided, that Sanders County did not legally establish a public highway within one year of abandonment, Avista argues in the alternative that title vests in it and the individual Defendants, as adjacent landowners, with each taking to the center line of the former right of way. According to Avista, "[b]ecause both Fannie Hampton and [it] were successors-in-interest to patentee, Arthur Hampton, at the time of the alleged abandonment of the right-of-way, an appropriate reading of § 912 in conjunction with the appropriations doctrine supports the center-line result." Pl.'s Summation Br, 12 (Mar. 9, 2007).

Avista's argument that it takes to the centerline of the abandoned right of way rests more heavily on the appropriations doctrine than it does on the plain language of Section 912. "Under the appropriations doctrine in American public land law, the land subject to the rights of way granted under the 1862 and 1864 acts was removed from the public domain when the United States granted the rights of way and railroads were built." *Home on the Range v. AT&T Corporation,* 386 F.Supp.2d 999, 1003 (S.D.Ind.2005). Because Northern Pacific received its land grant right of way pursuant to the 1864 Act, Avista takes the position that the land itself "was severed from the category of public lands under the appropriations doctrine" and claims that Arthur Hampton acquired no interest in the land subject to the right of way when he acquired his patent to Government Lot 5 in 1921. Pl.'s Response, 18. *See Home on the Range,* 386 F.Supp.2d at 1003. Assuming Hampton acquired no interest in the land underlying the right of way, Avista argues "[i]t was only by virtue of § 912 that [he] and his successors in interest acquired the United States' rever-

sionary rights" upon abandonment. Pl.'s Response, 21. As Avista notes, by the time Northern Pacific abandoned the right of way in 1958, Hampton's widow had conveyed to WWP "[a]ll that part of Government Lot 5...lying north of the" right of way. Defs.' Br. in Support, Ex. 3. Avista contends it became a successor in interest to Hampton by virtue of this deed, and maintains WWP and Hampton's widow "had equal reversionary rights to the right of way." Pl.'s Response, 22. Because WWP and Hampton's widow were both successors in title to the patentee, Avista argues "the only appropriate result under § 912 at the point of abandonment is to recognize the reversionary rights of each successor in interest and grant each title to the center line of the right of way." Pl.'s Response, 22.

Even assuming that Avista owns land adjacent to the right of way, its argument that it takes to the centerline of the former right of way based on the appropriations doctrine simply fails in the face of the plain language of Section 912. It is undisputed that Hampton's patent purported to convey to him the entirety of Government Lot 5, without exception for Northern Pacific's pre-existing right of way. Defs.' Br. in Support, Ex. 1. Regardless of whether Hampton took title to the land underlying the right of way by virtue of that patent, it cannot be disputed that the right of way traversed Government Lot 5. Also undisputed is the fact that Hampton's widow deeded to WWP only that small portion of Government Lot 5 lying north of the right of way. Because WWP's parcel lies to the north of the right of way, it cannot be said that the right of way traverses that property. Avista concedes this point.

On these facts, title to the abandoned right of way vests in the individual Defendants pursuant to the express provisions of Section 912. It is clear under Section 912

that if a public highway is not established within one year of the railroad's abandonment, the interest of the United States then vests in that person, or successors in title to that person, "to which title of the United States may have been or may be granted, conveying or purporting to convey the whole of the legal subdivision... traversed or occupied by such railroad...and this by virtue of the patent thereto..." This language describes Arthur Hampton, to whom the Government purported to convey all of Government Lot 5, which was traversed by the right of way. Even assuming Avista owns land adjacent to the right of way, it is not entitled to take to the centerline of the right of way under the plain language of Section 912. Title instead vests in the individual Defendants, as successors in title to the person to whom the United States purported to convey the whole of the subdivision traversed by the right of way.

Section 912 thus dictates the result in this case, and the appropriations doctrine discussed so thoroughly in *Home on the Range,* 386 F.Supp.2d at 1003–04, does not apply. In *Home on the Range,* AT & T buried and operated fiber optic telecommunications cables in the land within the boundaries of several railroad rights of way, including rights of way granted under the 1864 Act. *Home on the Range,* 386 F.Supp.2d at 1001. The plaintiffs were private landowners, and "[t]he legal descriptions of their properties encompass[ed] some portion of one of these rights of way." *Home on the Range,* 386 F.Supp.2d at 1001. The government had "issued land patents to plaintiffs' predecessors in interest after the railroad rights of way were established," and the plaintiffs claimed "that the patents gave their predecessors property interests in the rights of way that [were] infringed by [AT & T's] cables." *Home on the Range,* 386 F.Supp.2d at 1001. The court disagreed, concluding based on the appropriations

doctrine that plaintiffs' predecessors had not received title to the land underneath the 1864 Act rights of way. *Home on the Range,* 386 F.Supp.2d at 1024. While that court's interpretation of the appropriations doctrine is consistent with that advanced by Avista in this case, it did not involve the disposition of abandoned rights of way and says nothing about application of Section 912. It is Section 912, not the appropriations doctrine, that controls the result in this case.

The Court has thus far assumed for purposes of this discussion that Avista owns land adjacent to the abandoned right of way by virtue of the 1952 deed conveying to WWP "that portion of Government Lot 5 lying north" of the right of way. Whether Avista in fact owns land adjacent to the right of way, however, is less than clear. In 1953, Northern Pacific purported to relinquish to the United States the northernmost 100 foot wide strip of the right of way. Defs.' Br. in Support, Ex. 4 and 5. By 1953, however, Section 912 had effectively eliminated the right of reverter held by the United States. Because Northern Pacific had no legal basis for relinquishing the property to the United States, its relinquishment is better viewed as an abandonment of the northernmost 100–foot strip of the right of way. Under Section 912, title to that 100–foot strip would have vested in the successors to the original patentee, thereby separating the .84 acre portion held by WWP from the remainder of the right of way. Thereby deprived of its alleged status as an adjacent landowner, Avista's centerline argument fails on this basis as well.

### D. Conclusion

In sum, the Court concludes that Northern Pacific abandoned its right of way as of October 1958. Because Sanders County did not legally establish a public highway

1190

within one year of that date, pursuant to Section 912 title to the former right of way vests in the individual Defendants as successors in interest to the original patentee, subject only to WWP's flowage easement and the County's roads.